# Ben Avon Borough *v.* Ohio Valley Water Co., Appellant.

*Water companies—Rates—Valuation of property—Public Service Commission.*

When the question of rates to be fixed for a water company is before the Public Service Commission, the value of the whole property and the net return thereon must be considered. If the net return is fair for the present value of the whole property, there is no confiscation, yet the rate may be reasonable, though it fails to produce an investment return of the legal rate of interest, as where the business has not been developed sufficiently to be remunerative, or the plant has been over developed to meet the probable future demands of the business.

The value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property which legally enters into the question of the consideration of rates has increased in value since it was acquired, the company is entitled to the benefit of such increase, except where it has increased so enormously that normal rates based thereon would be prohibited. The basis of calculation is the fair value of the property for the convenience of the public. The weight of authority is in favor of the standard of present value as distinguished from the cost of reproduction, or the actual cost of construction.

Bonds and stocks issued largely in excess of value by and to parties interested in, and controlling the company, or issued on inflated or fictitious values afford no measure or guide for fixing present value.

The Public Service Commission in determining the value of the real estate of a public service company cannot take into consideration as an element to reduce the valuation, that the title to the real estate or a part thereof, may be successfully attacked. If the company's title should be taken away at some future time, and its value should be of such weight as to enter materially into the basis on which the schedule of rates is fixed, the commission can readily adjust the rates; but until that time, the company is entitled to what it bought, paid for, improved, and is using.

If certain of the real estate of a water company, such as a sand bar, advantageously situated in a stream, has a peculiar and a special value to the company, the company is entitled to have this value considered in rate making values. The value is not to be limited to the price fixed for land immediately adjoining or in the vicinity.

Where utility companies organize into one operating plant a number of smaller ones, they are entitled to a fair return from the values of the property purchased, and are not to be limited to the reduced cost of operation by reason of the consolidation. If it is economical to dismantle one of the plants, the value of such plant should not be taken from the books as a capital charge, until such time, through sale, or other equitable arrangement, such value has been amortized.

In determining the value of a property of a public service company for the fixing of rates, the commission should consider the "going value" or "going concern value," i. e., the value which inheres in a plant where its business is established as distinguished from one which has yet to establish its business. This element of value is a property right from which the owner is entitled to a fair return.

The time and money expended in the promotion of an enterprise,

the cost of securing and retaining customers, the loss of earnings on a reasonably well developed plant during its initial year, the increased value which comes from the consolidation of separate plants; these items, with the value that inheres in a plant with its business established, may be termed going concern cost or value, and such items are to be considered in determining the value of the plant for rate purposes.

In determining the value of a water company's plant for the purpose of fixing rates, interest should be allowed on the money used to construct the plant during the whole period of construction.

In ascertaining such value, brokerage or discounts on sale of the company's securities should be allowed as a part of capital charge for construction.

In fixing a schedule of rates that would produce a return on plant value mentioned in going cost, the fair way to the public is to treat such costs or values, as well as the other items of plant value, as a capital charge, and not to make the rates so high that such items would be returned to the investors from the first years of the business, or to distribute such cost over a given number of years, and gradually amortize it.

Argued May 7, 1917.   Appeal, No. 186, April T., 1917, by the Ohio Valley Water Company, from order of the Public Service Commission of Pennsylvania, Complaints Nos. 335, 415, 416, 417, 496, of 1915, in cases of Ben Avon Borough, McKees Rocks Borough, Bellevue Borough, Avalon Borough, Stowe Township, West View Borough, W. B. Dawson v. Ohio Valley Water Company.   Before ORLADY, P. J., PORTER, HENDERSON, HEAD, KEPHART, TREXLER and WILLIAMS, JJ.   Reversed.

Complaints against Ohio Valley Water Company on account of schedule of increased rates effective January 1, 1914.

All of the complaints alleged that the new rates were excessive.   After hearing, RILLING, Commissioner, filed the report of the commission, fixing a valuation of respondent's property and determining a rate thereon. On a petition for a rehearing the commission filed another report decreasing the valuation.   In this report the commission found inter alia as follows:

"Following is a statement showing in parallel columns the reproduction costs as summarized by the two parties of engineers arranged and grouped so as to afford a comparison. The costs as stated by each party of engineers are arranged in three columns, namely: (a) Reproduction Costs; (b) Depreciation; (c) Reproduction Costs less Depreciation. In another column is shown the findings of the Commission as to the reproduction costs after considering in detail the inventory and valuation submitted by the respondent, the report of the engineers in conference, the revised summaries referred to and the testimony of the engineers and others." (See page 565.)

*Errors assigned* showing the issues on appeal were in the following form:

1. The commission erred in making the following finding:

"The commission has reached the conclusion that the aggregate fair value of all the items set forth in the said summary of audits and appraisements which have been allowed and which comprise the entire property of respondent that is used and useful in the public service it is now rendering to the several municipalities served by it, is nine hundred and twenty-four thousand, seven hundred and forty-four dollars ($924,744) and that sum is the basis upon which its rate of return should be computed."

The said amount fixed by the commission is much less than the actual value of said property.

2. The commission erred in making the following conclusion:

"4. The fair value of the respondent's property as it is used and useful in its public service upon which to base its rate of return in addition to annual operating expenses and a proper allowance for depreciation, as of January 1, 1916, is nine hundred twenty-four thousand seven hundred forty-four dollars ($924,744)."

Report on Petition for Rehearing.

## REPRODUCTION COSTS

| Description | Amounts as Estimated by Engineers for Respondent | | | Amounts as Estimated by Engineers for Complainants | | | Amounts as Found by Commission | | |
|---|---|---|---|---|---|---|---|---|---|
| | Reproduction Cost New | Depreciation | Reproduction Cost New Less Depreciation | Reproduction Cost New | Depreciation | Reproduction Cost New Less Depreciation | Reproduction Cost New | Depreciation | Reproduction Cost New Less Depreciation |
| 1. Charter and Franchises | $19,163 00 | | $19,163 00 | $15,897 00 | | $15,897 00 | $9,191 00 | | 9,191 00 |
| 2. Wells | 21,714 00 | $6,121 00 | 15,598 00 | 21,714 00 | $6,121 00 | 15,598 00 | 21,714 00 | $6,121 00 | 15,593 00 |
| 3. Reservoirs | 58,972 00 | 468 00 | 58,504 00 | 58,212 00 | 408 00 | 57,744 00 | 58,212 00 | 468 00 | 57,714 00 |
| 4. Standpipe | 6,622 00 | 757 00 | 5,865 00 | 6,622 00 | 757 00 | 5,865 00 | 6,622 00 | 757 00 | 5,865 00 |
| 5. Pump Station | 46,707 00 | 3,237 00 | 43,450 00 | 36,263 00 | 3,237 00 | 33,006 00 | 46,707 00 | 3,237 00 | 43,450 00 |
| 6. Machinery | 106,150 00 | 46,649 00 | 59,501 00 | 104,981 00 | 46,649 00 | 58,292 00 | 106,150 00 | 46,649 00 | 59,501 00 |
| 7. Pipe Lines | 497,355 00 | 9,198 00 | 488,157 00 | 487,290 00 | 9,198 00 | 478,092 00 | 497,355 00 | 9,198 00 | 488,157 00 |
| 8. Fire Hydrants | 13,522 00 | 1,142 00 | 12,380 00 | 13,522 00 | 1,142 00 | 12,380 00 | 13,522 00 | 1,142 00 | 12,380 00 |
| 9. Meters | 34,876 00 | 6,584 00 | 28,342 00 | 34,876 00 | 6,584 00 | 28,342 00 | 34,876 00 | 6,584 00 | 28,342 00 |
| 10. Motor Truck | 465 00 | 17 00 | 448 00 | 465 00 | 17 00 | 448 00 | 465 00 | 17 00 | 448 00 |
| 11. Tools and Supplies | 13,283 00 | 1,068 00 | 12,215 00 | 13,283 00 | 1,068 00 | 12,215 00 | 13,283 00 | 1,068 00 | 12,215 00 |
| 12. Real Estate | 293,166 00 | | 293,166 00 | 24,468 00 | | 24,468 00 | 75,000 00 | | 75,000 00 |
| 13. Dwelling Houses | 5,600 00 | | 5,600 00 | 5,600 00 | | 5,600 00 | 5,600 00 | | 5,600 00 |
| 14. Office Furniture and Fixtures | 3,113 00 | 523 00 | 2,590 00 | 3,113 00 | 523 00 | 2,590 00 | 3,113 00 | 523 00 | 2,590 00 |
| Monogahela Water Company System | | | | | | | | | |
| 15. (a) Non-parallel lines | 18,963 00 | 597 00 | 18,365 00 | 18,962 00 | 597 00 | 18,365 00 | 18,962 00 | 597 00 | 18,365 00 |
| 16. (b) Parallel lines | 66,073 00 | 2,051 00 | 63,992 00 | | | | 22,024 00 | 693 00 | 21,831 00 |
| 17. Paving over mains laid after paving | 8,128 00 | 98 00 | 8,025 00 | | | | | | |
| 18. Paving over mains laid before paving | 96,889 00 | 1,162 00 | 95,677 00 | 7,730 00 | 98 00 | 7,637 00 | 7,730 00 | 98 00 | 7,637 00 |
| Total | $1,310,705 00 | $79,672 00 | $1,231,033 00 | $852,948 00 | $76,424 00 | $776,524 00 | $941,126 00 | $77,117 00 | $864,009 00 |
| 19. Engineering, Omissions and Contingencies* | 97,419 00 | 7,761 00 | 89,658 00 | 79,486 00 | 6,488 00 | 73,048 00 | 88,627 00 | 7,580 00 | 76,047 00 |
| 20. General Administration during construction | 19,438 00 | 1,552 00 | 17,931 00 | 15,897 00 | 1,288 00 | 14,609 00 | | | |
| 21. Interest during construction† | 108,843 00 | 4,825 00 | 108,518 00 | 50,339 00 | 3,587 00 | 46,752 00 | 2,400 00 | 194 00 | 2,206 00 |
| 22. Operating Capital | 25,000 00 | | 25,000 00 | 25,000 00 | | 25,000 00 | 46,672 00 | 3,770 00 | 42,902 00 |
| 23. Brokerage | 117,442 00 | | 117,442 00 | | | | 10,000 00 | | 10,000 00 |
| 24. Going Cost | 220,000 00 | | 220,000 00 | | | | | | |
| 25. Reproduction Costs | $1,898,392 00 | $83,810 00 | $1,504,582 00 | $1,028,670 00 | $87,787 00 | $985,983 00 | $1,088,825 00 | $88,661 00 | $985,164 00 |

*10 per cent. on items 2 to 9, inclusive, and 15, 17 and 20.
†6 per cent. on items 1 to 20, inclusive, and item 22, for nine months (one-half construction period).

The said amount fixed by the commission is much less than the actual value of said property.

3. The commission erred in making the following finding:

"The commission has reached the conclusion that the aggregate fair value of all the items set forth in the said summary of audits and appraisements which have been allowed and which comprise the entire property of respondent that is used and useful in the public service it is now rendering to the several municipalities served by it, is nine hundred and twenty-four thousand seven hundred and forty-four dollars ($924,744), and that sum is the basis upon which its rate of return should be computed."

The commission merely fixes the lump sum of $924,-744 as the value of the property of appellant and does not give the items making up said value. It is essential that the items be given in order that appellant may understand the method of valuation and take such steps as may be required for the protection of its rights in appealing to the courts.

4. The commission erred in not finding that the value of the property of appellant for rate-making purposes was at least $1,500,000.

5. The commission erred in making the following finding:

"The commission has determined that the respondent is entitled to 7% on the fair value of its property as ascertained herein as a fair return to the owners over and above its necessary and operating expenses and depreciation. The annual operating expenses we have fixed at $63,500 and the commission is of opinion that an annual sum equal to ¾ of 1% of the fair value should be allowed for depreciation. This amounts to $6,935.58, which, added to the operating expenses and fair return, make a total gross annual revenue to be received by the respondent as follows:

| | |
|---|---|
| Fair return 7% ............... | $64,732.08 |
| Annual operating expenses ..... | 63,500.00 |
| Annual depreciation, ¾ of 1% .. | 6,935.58 |
| | |
| Gross revenue ............ | $135,167.66" |

The gross revenue of $135,167.66 allowed by the commission is wholly inadequate.

6. The commission erred in not finding that the gross revenue to which appellant is entitled is at least $200,-000.

7. The commission erred in making the following finding:

"The commission has determined that the respondent is entitled to 7% on the fair value of its property as ascertained herein as a fair return to the owners over and above its necessary and operating expenses and depreciation. The annual operating expenses we have fixed at $63,500 and the commission is of opinion that an annual sum equal to ¾ of 1% of the fair value should be allowed for depreciation. This amounts to $6,935.58, which, added to the operating expenses and fair return, make a total gross annual revenue to be received by the respondent as follows:

| | |
|---|---|
| Fair return, 7%, ................ | $64,732.08 |
| Annual operating expenses, ....... | 63,500.00 |
| Annual depreciation, ¾ of 1%,.... | 6,935.58 |
| | |
| Gross revenue, ............... | $135,167.66" |

The return of 7% on the value of the property as ascertained by the commission, viz: $64,732.08, is wholly inadequate.

8. The commission erred in making the following conclusion:

"6. The respondent is entitled to have a rate of return upon the fair valuation of its property used and useful

as herein found, of 7% over and above its necessary annual operating expenses and a proper allowance for depreciation."

The return of 7% upon the value of appellant's property allowed by the commission, over and above operating expenses and depreciation, is wholly inadequate.

9. The commission erred in making the following finding:

"On account of the increased cost of labor and materials at this time, the operating expenses will be accordingly increased, and in our calculation we think it is proper that we should add six per cent. to the total cost of operation for the year 1914, making a total of practically $63,500 per annum as the cost of operation of the respondent company, which we will use as a basis for our computation in determining the amount of gross revenue of respondent."

The amount of $63,500 allowed by the commission for annual operating expenses is wholly inadequate.

10. The commission erred in making the following finding:

"The commission has determined that the respondent is entitled to 7% on the fair value of its property as ascertained herein as a fair return to the owners over and above its necessary and operating expenses and depreciation. The annual operating expenses we have fixed at $63,500, and the commission is of opinion that an annual sum equal to 3/4 of 1% of the fair value should be allowed for depreciation. This amounts to $6,935.58, which, added to the operating expenses and fair return, make a total gross annual revenue to be received by the respondent as follows:

Fair return 7%, ................$64,732.08
Annual operating expenses, ....... 63,500.00
Annual depreciation, 3/4 of 1%, .... 6,935.58
                                   ──────────
Gross revenue, ................$135,167.66"

The annual depreciation of ¾ of 1%, viz: $6,935.58, allowed by the commission is wholly inadequate.

11. The commission erred in making the following conclusion:

"7. The respondent shall be allowed an annual depreciation of three-fourths of one per cent. of the fair value of its property, to wit: $6,935.58."

The annual depreciation of ¾ of 1%, viz: $6,935.58, allowed by the commission is wholly inadequate.

12. The combination of the valuation of appellant's property and the revenue allowed by the commission therefrom amounts to the confiscation of the property of appellant.

13. The report, findings, conclusions, ruling, determination and order of the commission amount to a deprivation of property without due process of law in violation of the Fourteenth Article of Amendment to the Constitution of the United States and of the first and tenth sections of the First Article of the Constitution of Pennsylvania.

14. The report, findings, conclusions, ruling, determination and order of the commission alter, revoke or annul the charter of appellant company in such manner that injustice is done to the incorporators in violation of the tenth section of the Sixteenth Article of the Constitution of Pennsylvania.

15. The report, findings, conclusions, ruling, determination and order of the commission impair the obligation of the contract between the appellant company and the Commonwealth of Pennsylvania, embodied in the charter of petitioner, in violation of the tenth section of the First Article of the Constitution of the United States.

16. The commission erred in making the following conclusion:

"5. The rates and minimum charges contained in the schedules filed by respondent on December 30, 1913, to take effect December 31, 1913, are unjust, unreasonable,

inadequate, unjustly discriminatory and unduly and unreasonably preferential."

The said charges are fair and reasonable.

17. The commission erred in making the following finding:

"In conformity with the views herein expressed we recommend that the respondent should within a reasonable time acquire all the meters now owned by any of its patrons at a reasonable price. The total sum expended by respondent in acquiring such meters will be a proper item to be included in its capital account."

The said finding is erroneous and not justified by the evidence.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

20. The commission erred in making the following finding:

"We have not allowed any amount for discount or brokerage, for the reason that no sufficient evidence was furnished showing that any sum had been paid by the respondent for that purpose."

The evidence showed that the item of discount or brokerage was allowed for and paid by appellant in cash or securities.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

27. The commission erred in entering the following order:

"This matter being before the Public Service Commission of the Commonwealth of Pennsylvania upon complaints and answers on file and having been duly heard and submitted by the parties and the commission after full hearing and investigation, having made and filed of record a report containing its findings of fact and conclusions thereon, which report is hereby approved and made a part hereof:

"Now, to wit, February 12, 1917, the Ohio Valley Water Company is ordered and directed, on or before March 1, 1917, to file, post and publish a supplement to

its tariffs, schedules, rules and regulations which shall carry into effect the determinations and conclusions of this commission with regard to service and the charges therefor contained in the above mentioned report."

*William Watson Smith,* of *Gordon & Smith,* for appellant.—The broadest powers are vested in the appellate courts upon an appeal from an order of the Public Service Commission: Mount Union Borough v. Mount Union Water Co., 63 Pa. Superior Ct. 337; Jenkins Twp. v. Public Service Commission, 65 Pa. Superior Ct. 122; Bellevue Borough v. Ohio Valley Water Co., 245 Pa. 114.

The returns to the water company is to be calculated upon the present value of its property: Wilcox v. Consolidated Gas Co., 212 U. S. 19; Minnesota Rate Cases, 230 U. S. 352.

The cost of reproduction of a plant usually plays the most important part in determining its value: Duluth Street Ry. Co. v. R. R. Com., P. U. R. 1915, D-192.

We maintain that to the reproduction cost as found by complainant's engineers in the Statement of Audits and Estimates set forth in the Report of the Commission the sum of $225,000 should be added for Going Value: Turtle Creek Borough v. Penna. Water Co., 243 Pa. 401; Spring Val. Water Works v. City of San Francisco, 124 Fed. 574; Galena Water Co. v. Galena, 74 Kan. 624; Venner v. Urbana Water Works, 174 Fed. 348; Knoxville v. Knoxville Water Co., 212 U. S. 1; Gloucester Water Supply Co. v. Gloucester, 179 Mass. 365; Des Moines Water Co. v. City of Des Moines, 192 Fed. 193; Pioneer Tel. & Tel. Co. v. Westenhaver, 118 Pac. 354; Public Service Gas Co. v. Board of Public Utility Commissioners, 84 N. J. L. 463; People v. Willcox, 210 N. Y. 479; Beloit v. Beloit Water, Gas, Etc., Co., P. U. R. 1915, B-1005; Pub. Service Com. v. Seattle Lighting Co. P. U. R. 1915, B-135; Leavenworth v. Leavenworth C. & F. L. Water Co. P. U. R. 1915, B-611; Municipal

League of Phœnix v. Pacific Gas & Electric Co., P. U. R. 1915, F-1031; Peru Heating Co., P. U. R. 1915, E-502; Peck v. Indianapolis L. & H. Co., P. U. R. 1916, B-445; In re Indianapolis Tel. Co. P. U. R. 1916, D-507; In re Richmond L., H. & P. Co., P. U. R. 1917, B-300.

We call the court's attention to some of the recent decisions showing that the item of engineering and contingencies is commonly allowed in rate cases: Mountain States Tel. & Tel. Co., P. U. R. 1917, B-198; Moritz v. Edison Electric Illuminating Co. P. U. R. 1917, A-364; Roundup v. Roundup Coal Mining Co., P. U. R. 1916, D-393; Butler v. Lewistown A. & W. Street Ry. Co., P. U. R. 1916, D-25; Commercial Club v. Terre Haute Water Co., P. U. R. 1916, B-180; Petaluma & S. R. R. Co., P. U. R. 1915, C-742; Meek v. Consumers Elec. L. & P. Co., P. U. R. 1915, A-956; Washington & Maryland R. R. Co., P. U. R. 1915, B-558; Chesapeake & Potomac Tel. Co., P. U. R. 1916, C-925.

The item of interest during construction is commonly allowed in rate cases: Turtle Creek Borough v. Penna. Water Co., 243 Pa. 401; Murchie v. St. Croix Co., P. U. R. 1917, B-384; Ann Arbor R. R. Co. v. Fellows, P. U. R. 1917, B-523; Mountain State Tel. & Tel. Co., P. U. R. 1917, B-198; Hermann v. Newton Gas Co., P. U. R. 1016, D-825; Roundup v. Roundup Coal Mining Co., P. U. R. 1916, D-393; In re Washington & Maryland Ry. Co., P. U. R. 1915, B-558; Chesapeake v. Potomac Tel. Co., P. U. R. 1916, C-925; Columbia v. Watts Engineering Co., P. U. R. 1915, B-921.

Brokerage is allowed: Montana W. & S. R. Co. v. Morley, 198 Fed. 991; Superior Commercial Club v. Superior Water, Light & Power Co., 10 Wis. Ry. Commission Rep. 704; In re Janesville Water Co., P. U. R. 1915, A-178; In re Omaha & Lincoln Ry. & L. Co., P. U. R. 1916, B-564.

In connection with such items as engineering and contingencies, general administration, interest during construction, etc., we respectfully call the court's attention

to the following cases: Lincoln v. Lincoln W. & L. Co., P. U. R. 1917, B-1; In re Union Transfer Co., P. U. R. 1917, A-225; In re Bay State Rate Cases, P. U. R. 1916, F-221; West Allis v. W. A. S. Co., P. U. R. 1916, D-740; Mantua Twp. v. New Jersey S. Co., P. U. R. 1916, C-163; Bogart v. Wisconsin Tel. Co., P. U. R. 1916, C-1020; Peck v. Ind. L. & H. Co., P. U. R. 1916, B-445; Cent. Pacific R. Co., P. U. R. 1916, B-845; Belleville v. St. Clair County G. & E. Co., P. U. R. 1916, B-24; In re Trenton & M. Co. T. Corp., P. U. R. 1916, B-232; Moore v. Merchants H. & L. Co., P. U. R. 1916, B-499; In re Newton G. & E. Co., P. U. R. 1916, A-514; In re Bronx G. & E. Co., P. U. R. 1916, A-440; In re Gillespie Home Tel. Co., P. U. R. 1915, E-214; Commercial Club v. Mo. P. U. Co., P. U. R. 1915, C-1017; Oblong Gas Co., P. U. R. 1915, A-598; Beloit v. Beloit Water Gas & Elec. Co., P. U. R. 1915, B-1005.

We call the attention of the court to the following authorities as to what is a fair rate of return: Canada Southern Ry. v. International Bridge Co. L. R., 8 App. Cas. 723; Metzger v. Beaver Falls, 178 Pa. 1; Wilkes-Barre v. Spring Brook Water Supply Co., 4 Lack. L. N. 367; State Journal Printing Co. v. Madison Gas & Elec. Co., 4 Wis. R. R. Com. 501; Penna. R. R. Co. v. Philadelphia County, 220 Pa. 100; Willcox v. Consolidated Gas Co., 212 U. S. 19; Cumberland Tel. & Tel. Co. v. City of Louisville, 187 Fed. 637; Pioneer Tel. & Tel. Co. v. Westenhaver, 118 Pac. 354; Arkadelphia Elec. Light Co. v. City, 137 S. W. 1093; Puget Sound Elec. Ry. Co. v. Railroad Commission, 117 Pac. 739; Des Moines Water Co. v. City of Des Moines, 192 Fed. 193; Western Ry. of Alabama v. Railroad Commission of Alabama, 197 Fed. 954; People v. Wilcox, 141 N. Y. Supp. 677; Maxwell v. Brady Tel. Co., P. U. R. 1915, A-471; In re Dakota Cent. Tel. Co., P. U. R. 1915, A-562; Meek v. Consumer Elec. L. & P. Co., P. U. R. 1915, A-956; In re Ladysmith Lighting Co., P. U. R. 1915, A-1050; Rochester v. New York State Railways Co., P. U. R. 1915, A-1095; Woon-

socket v. Schuler Elec. & Tel. Co., P. U. R. 1915, B-233; Fort Scott Gas & Elec. Co. v. Fort Scott, P. U. R. 1915, B-481; In re Sabetha Mut. Tel. Co., P. U. R. 1915, B-507; City of Columbia v. Watts Engineering Co., P. U. R. 1915, B-921; Marquis v. Polk County Tel. Co., P. U. R. 1915, C-140; In re Colfax Tel. Ex., P. U. R. 1915, C-188; Simms v. Columbia Tel. Co., P. U. R. 1915, C-366; Arizona Corporation Commission v. Morenci Water Co., P. U. R. 1915, C-525; Matton v. Coles County Tel. & Tel. Co., P. U. R. 1915, C-660; City of Bend v. Bend Water, Etc., Co., P. U. R. 1915, F-913.

*David L. Starr*, with him *Albert G. Liddell, James Mc-Laren* and *Leonard K. Guiler*, for appellee.—The Public Service Commission of Pennsylvania has stated on numerous occasions, it would not allow competition where the active company was performing its duties in a reasonable manner: Metzger v. Beaver Falls Boro., 178 Pa. 1; Penna. Water Co. v. Pittsburgh, 226 Pa. 624; White v. Meadville, 177 Pa. 643; Penna. Water Co. 226 Pa. 624.

That the claim of the respondent company in reference to its sand bar giving it a monopoly as to filtration and thus increasing its capital cost should be allowed is denied in Spring Valley Water Works v. San Francisco, 192 Fed. 137. Judge FERRINGTON states that it is inconsistent with justice and equity that rates should be increased in order to pay return on capitalization value of exclusive location or from monopoly that represents no actual investment and that a location secured by this method for a public purpose cannot be capitalized against the very public purpose it was intended to serve: Brunswick & T. Water Dist. v. Maine Water Co., 99 Me. 371; Meek v. Consumers L. & P. Co., P. U. R. 1915, A-956; Wainwright v. McCullough, 63 Pa. 66; Allegheny City v. Reed, 24 Pa. 39; Poor v. McClure, 77 Pa. 214; Stover v. Jack, 60 Pa. 339; Conneaut Lake Ice Co. v. Quigley, 225 Pa. 605; Foust v. Dreutlein, 237 Pa. 108.

The values which respondent seeks on its other lands

are limited by the general increases in neighboring properties; and not because of its present use: Minnesota Rate Cases, 230 U. S. 352.

The owner is entitled to a return only upon the fair value of the property necessary for the particular use: Brunswick v. Maine Water Co., 99 Me. 371; San Diego L. & T. Co. v. Jasper, 189 U. S. 439; Covington & Lexington Turnpike Road Co. v. Sanford, 164 U. S. 578.

Courts and commissions have in most recent years considered going value as the actual cost of establishing business: Spring Valley Waterworks v. San Francisco, 192 Fed. 137; Cumberland T. & T. Co. v. Louisville, 187 Fed. 637; Montana Wyoming & Southern R. R. Co. v. Morley, 198 Fed. 991; Kings County Lt. Co. v. Wilcox, 210 N. Y.; Hanover Borough v. Hanover Sewer Co., 251 Pa. 95; Turtle Creek Borough v. Penna. Water Co., 243 Pa. 413.

*Berne H. Evans,* for Public Service Commission.

OPINION BY KEPHART, J., October 8, 1917:

The Ohio Valley Water Company was incorporated in 1903 and in 1904 it purchased the property and franchises of a number of water companies which had charter powers to operate in various parts of the district now supplied by the appellant. The companies then doing business were the Valley Consolidated, Perrysville, and Fleming Park. In May, 1913, the appellant purchased the controlling capital stock of the Monongahela Water Company and later, through sale, the property of the Monongahela Company was transferred to it. On December 30, 1913, it adopted a schedule of rates which has given rise to the present controversy. Since the adoption of these rates, many of the boroughs instituted proceedings to restrain the collection of the new rates. These proceedings were not successful, and in December, 1914, complaints were filed before the Public Service Commission. The commission filed a report February

12, 1917. From that finding, the Ohio Valley Water Company has appealed. At the time the valuation was fixed the appellant had outstanding $1,000,000 bonds, $110,000 floating debt, and $1,000,000 capital stock. The commission found the value of the appellant's property for a rate basis to be $924,744. Our consideration is limited to whether the rates fixed upon the valuation as found are reasonable and in conformity with law. In determining the questions of rate making value and rates, the commission is given extensive powers to be exercised after a thorough consideration of the business from the most accurate knowledge obtainable. The questions present matters of such grave importance as to call for the most careful consideration by the commission designated by the legislature to act. A rate that is too low may deprive the members of the corporation of property that cannot be returned and if too high, the public is unjustly deprived of property. Rates should not be speculative or put in operation for the purpose of determining whether too low or too high. Before that question can be answered, a loss of property may result. The business of rate making should not be an effort to impose on either the public or the corporation; and, while it may be true that some corporations in the past have acted unfairly to the public, that would not justify a confiscatory valuation by the commission or a lowering of rates causing a confiscation. Rate making contemplates fair dealing between the company and the public. When the question of rates to be fixed is before the commission, the value of the whole property and the net return thereon must be considered. If the net return is fair for the present value of the whole property, there is no confiscation: Minneapolis & St. Louis R'D. Co. v. Minnesota, 186 U. S. 257. Yet the rate may be reasonable, though it fails to produce an investment return of the legal rate of interest, as where the business has not been developed sufficiently to be remunerative, or the plant has been over-developed to meet the

probable future demands of the business: San Diego Land & Town Co. v. Jasper, 189 U. S. 439. The public is entitled to be served at reasonable rates on the value of the property used in the public service. The company is entitled to a rate that will allow it a fair return. To induce investment and the continuance of capital, there must be some gain commensurate with that of any other business. The mere assurance that the investment will not be confiscated will not suffice. Section 20 of Article V of the Public Service Act prescribes the elements of value which may enter into the commission's determination in fixing the fair or present value of the appellant's property.

"The value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property, which legally enters into the question of the consideration of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase": Willcox v. Consolidated Gas Co., 212 U. S. 19-52. Of course, there are exceptions to this general rule as where the property has increased enormously in value so that normal rates based thereon would be prohibitive. The basis of calculation is the fair value of the property used for the convenience of the public. "What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public": The Minnesota Rate Cases, 230 U. S. 352-434, and cases therein cited. The weight of authority is in favor of the standard of present value as distinguished from the cost of reproduction, or the actual cost of construction: San Diego Land & Town Co. v. Jasper, supra.

Original cost, assuming that the books of old concerns correctly recorded all of the items that went into cost, which would be quite rare, would not take into consideration many of the incidental features of expense which companies must meet, nor would it make any allowance

for any "increase in value" in the physical property. And it is admitted in this case that as to certain items of physical property "a record of the original cost could not be obtained or . . . . . . the book cost was not a true statement of the historical cost" in the sense of original cost. It is not remarkable that in reaching original cost from the books the results of the different experts should closely coincide. "In ascertaining the present value we are not limited to the consideration of the amount of the actual investment. If that has been reckless or improvident, losses may be sustained which the community does not underwrite." Nor should the public be required to underwrite these investments where bad management, or the falling off in business, causes the value to fall below original cost. "As the company may not be protected in its actual investment, if the value of its property be plainly less (than original cost), so the making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law": The Minnesota Rate Cases, supra, 454. The present value represents more than the cost of reproduction, which is the present day cost of the real estate, machinery, equipment or plant, labor of installing or construction, and putting in place to perform its various functions. These constitute, as Mr. Justice LURTON says, in Omaha v. Omaha Water Co., 218 U. S. 180-202, "the bare bones of the plant, its physical properties." The expenditures beyond physical cost are sometimes called overhead charges, and some of the items are termed preliminary, developmental, or going concern costs, or value. To these bare bone charges must be added "time and money expended in the promotion of the enterprise; in the organization of the company and interesting capital therein, including, also, legal expenses, obtaining the necessary franchise, as well as the costs of incorporating

the company"; engineering and superintendency; losses arising from accidents to men and material during the construction period; expenditures bound to be made by reason of the incompleteness of plans, always attached to the most perfectly planned work; the cost of administration; interest paid during construction; securing and retaining customers; the loss of earnings during the time usually required in a well managed, progressive plant to build up its business; the loss from unsuccessful experiments, intended to protect life and property, or reduce operating cost, or increase the efficiency of the service; the installation of machinery made necessary through the progress of scientific development, thereby causing good but inferior machinery to become obsolete, increased public demands causing the present equipment to become inadequate through lack of capacity and its replacement necessary; the cost usually attendant upon the consolidation of many plants into one efficient organization, the benefit of which should be reduced cost of operation and better service; and the increased value of such consolidated plants over the separate units that formerly composed them: Des Moines Gas Co. v. Des Moines, 238 U. S. 153-166; Public Service Co. v. Board of Public Utilities, 84 N. J. Law 463 (87 Atl. 651); People v. Willcox, 210 N. Y. 479; Omaha v. Omaha Water Co., supra. Rare, indeed, is it that a utility, or any other concern, can launch into business without encountering most of the items of expense here enumerated. A company does not receive a fair valuation when the cost of its physical property alone is considered. Nor do we wish to be understood as saying that the exchange value used in condemnation and sale should be the basis upon which the rate should be determined. In this latter value, the income is assured and its continuance enters into and affects it. In exchange or selling value, the ability of the utility to produce earnings is a large factor, if not the controlling factor; but such value of necessity takes into consideration the monopo-

listic feature of a utility. It produces earnings by virtue of the commodity it sells; its position in public life to command sale from the compulsory aspect which causes the inhabitant to buy, whether he will or not. These companies secure an added value from these causes.

Bonds and stocks issued largely in excess of value by and to parties interested in and controlling the company, or issued on inflated or fictitious values, afford no measure or guide for fixing present value: Knoxville v. Knoxville Water Co., 212 U. S. 1. The investor in a public enterprise must know that at some time the State may step in and exercise its regulatory control and fix returns on the fair value of the utility. If, in corporate management, large amounts of securities are issued on values that do not exist, the investors in common must bear the loss. The commission did not err in declining to consider issues of stocks and bonds on over inflated values as affecting the rate making base of the property under consideration. It presented little, if any, light on the subject. The commission, in the present case, received evidence tending to show the original cost and the reproduction cost. It then endeavored to fix a fair present value for rate making purposes. Voluminous testimony, oral and written, was taken. More than two thousand printed pages make up the record. The commission filed its report fixing the rates as of January 1, 1916. During the course of the hearing, the engineers for the appellant and the various boroughs agreed upon the reproduction cost of a number of the items making up appellant's property, which were accepted by the commission as their reproduction cost. Depreciation, though largely theoretical in its nature, which is allowed on the reproduction cost seems to have a fixed place in valuation. If, however, replacements and renewals are amply provided for and made, depreciation only to a very small extent takes place. If, through depreciation, the value of the property is largely reduced, the securities which

were placed thereon may be unnecessarily reduced. As these charges withdraw from the rate making base, such depreciation naturally effects a purchase of a part of the property for the consumer, a thing never contemplated. A rate for renewals and replacements should be provided and expended for that purpose; when that is done, as is the custom in every utility concern, depreciation is a very small fractional per cent. This should be placed in a reserve and it, with renewals and replacements, is properly allowable in fixing a schedule of rates. All of the assignments of error have relation to the items which the engineers could not agree upon and which the commission declined to find as contended for by the appellant. They relate to, (1) real estate and right-of-way; (2) the parallel lines of the Monongahela Water Company system; (3) going value, or going concern value; (4) engineering and contingencies; (5) interest during construction; (6) brokerage.

Considering these items in their order, in the light of the foregoing discussion, we do not feel that the commission committed any error in the value fixed for the Bellevue and Stowe Township reservoirs. The Neville Island property presents a much more difficult proposition. The appellant purchased several acres of land upon which it drilled a number of wells and secured a supply of pure water which it pumped into its mains and with it furnished between nine and ten thousand families. The daily production from these wells amounted to 4,-500,000 gallons, and could readily be increased. The appellant contends that the particular value comes from the location of a sand bar within the property line through which the water percolates into the wells, thereby enabling the appellant to furnish filtered water to its consumers. The appellees urge that inasmuch as some of this property is within the harbor lines, it is necessary for the appellant to secure a permit from the United States government to sink its wells, which permit may be revoked at any time and the wells rendered

useless for use.  This theory of the appellees to reduce the value of the appellant's property cannot be sustained.  Considering the testimony as to what relative claims might arise between the Federal government and the appellant as to the ownership or use of the land in question, the presumption of ownership is with the grantee, who is in the possession and use of the property. As against the entire world, its rights are, so far as the commission is concerned, free from dispute.  It presents a title in fee simple, which, with possession and actual use, ought certainly to outweigh any remote possibility of danger from the government, even if they could assert a right.  But the commission cannot enter into such disputed questions of title.  When sufficient evidence is presented of a prima facie title, such as that before the court, the commission cannot act as a court and jury and determine the question of title adversely to the utility company and deprive it of a rate of return on its property in use on the complaint of one having no interest of any kind in the property in question.  If the appellant's title should be taken away at some future time, and its value should be of such weight as to enter materially into the basis on which the schedule of rates was fixed, the commission can readily adjust the rates; but until that time, the appellant is entitled to what it bought, paid for, improved and is now using.  A special value is claimed for this property.  The appellees would limit it to the price fixed for lots immediately adjoining, or in the vicinity; it is contended that water of the same quality as secured by appellant could be procured from the adjoining lots.  The appellant is dealing with what has been done, and not with a problematical use of adjoining properties; and, while it was shown that one particular property produced a certain supply of water for one well, we have here a property on which is located a number of wells, with a sand bar, which, according to the government engineer, was approached in size by none within a space of five miles down the stream

and two miles up the stream. It is advantageously located for supplying the appellant's territory, and if located at other points, additional pipe and large operating expense would be encountered; because the appellant dug some wells in the back channel to be used as a reserve supply, should not reduce the value of this water supply. That was expedient and necessary to every well conducted concern that wishes to render efficient service continuously to its customers. It may be, as stated by Mr. Justice HUGHES in the Minnesota Rate Cases, supra, that real estate should not receive an enhanced value beyond that of communal growth and that the real estate of a railroad company should not be valued beyond that of contiguous properties or for its worth to the railroad; but that court, while disallowing condemnation value for real estate, was particular to say that real estate is entitled to a fair market value for all its available uses and purposes or if it has a peculiar value or special adaptation for a particular use, these items should be considered in the rate making values. There is a difference between increased value which accrues by reason of the concentration of population along the utility's lines and the value which results from the centralizing of real property, mechanical appliances, machinery, equipment and business sagacity into a successful industry which produces large returns of the particular commodity which these energies were bent on bringing forth. For many years this property remained idle, when the men with the idea and capital developed it. Such property, so worked upon, has an added value undoubtedly beyond that of the mere cost of the machinery, the labor and pay of the man who conceived the idea, or the value of the adjoining property, or in the immediate vicinity. In this case the public has been benefited in that it is able to procure a commodity of-purer quality in large quantities. If a fair rate making value cannot be given this increased value, then much of the efforts of managers to procure satisfactory

and suitable agencies to reduce the cost or better the service of utilities would be seriously handicapped. It has been held in a number of cases that the full extent of this value can be included in the exchange values. The property should not be considered in the light in which the appellees' witnesses place it for building or manufacturing purposes. It is not entitled to the measure of value fixed by the appellant, that is, what it would cost to reproduce the supply of water if it were taken away. Between the extremes of the evidence introduced there is a fair value. While it might be difficult to determine, nevertheless, confiscation cannot be permitted because of difficulties. The commissioner, who heard the testimony, fixed it at $100,000. He possibly was in a better position to judge than any one. The commission's value of $48,800 did not consider all the elements that tended to make up the value of this property. It is directed that the value be increased as indicated by this opinion.

In considering the value of the parallel lines of the Monongahela Water Company, the commission allowed one-third of the reproduction cost, $21,331. The Monongahela Water Company supplied water to McKees Rocks and parts of Chartiers and Stowe Townships. A part of its supply was in competition with the appellant. Prior to 1913, this company offered a part of its property to the appellant, but we do not find any evidence where the entire property was offered to it. In 1913, the Ohio Valley Company purchased ninety-seven per cent. of the outstanding stock of the Monongahela Water Company from persons, one of whom was not connected with the appellant and the other in a very small way. It paid for this stock notes amounting to $100,000 and stock amounting to $192,450. Subsequently a number of shares were purchased for $662.46. The appellant was practically the owner of the Monongahela plant. It appears from the evidence that the persons who sold the stock to the appellant paid for it close to

$70,000. After the sale to the appellant, the Monongahela Water Company sold to the Ohio Connecting Railroad Company a pumping station for $60,000. A pipe line was sold to the City of Pittsburgh for $4,-325.94, and the remainder of the physical property, with cash on hand and accounts receivable, was sold to the appellant for $30,000. Stripped of all questions of corporate stock, the total amount of cash participated in by the Ohio Valley Company, through sale, etc., was $77,-068.80, and the physical property that remained of the Monongahela Company was the property of the appellant. The engineers representing both parties estimated the reproduction cost of this property, after this cash distribution, at $82,357. This company's property seems to have been segregated from the rest of appellant's property and dealt with separately by the commission in valuation. It is evident that at the time the property changed hands, and that for all practical purposes was when the appellant bought ninety-seven per cent. of the stock, without considering any exchange or present value, the physical value of the property was actually worth $159,425.80; the commission fixed the original cost of this property at $17,257, or the purchase-price of the physical property now in possession of the appellant less accounts receivable and cash on hand. When the commission, in original cost, considered the first purchase made by the appellant, it did not consider the exchange or selling price of the property. For original cost it took the cost as nearly as it could be ascertained that was necessary to produce the property under consideration and that, of course, was very much lower than selling price as represented by the stocks and bonds paid for the properties. We do not attempt to justify the conduct of the officers in forcing such sale with respect to the minority stockholders of the Monongahela Company, or in issuing to the majority owners of the stock of the Monongahela Company stock and bonds in excess of what appears to be that value of

the plant; nor is it necessary for us to enter into a discussion of the other items of value that it is urged would justify the price paid. The appellant asks here that it be allowed full value for its parallel lines in McKees Rocks, and this, we think, is a proper request. If utility companies in organizing into one operating plant a number of smaller ones must be deprived of a fair return on the values of the properties purchased and are also limited to the reduced cost of operation by reason of such consolidation, it is evident that the more practical way would be to permit the companies to remain separate operating concerns. The public is entitled to a fair benefit from every such move made by a utility concern, and where they assemble a number of plants with separate overhead and operating charges into one plant with one overhead charge and one or more operating plants, while the operating plant of some of the separate units may be rendered useless, still the new concern has paid for it, and capital was originally and is now invested on its account. Investors could not be induced to traffic in such an unsatisfactory and unstable security, where the risk is not failure by reason of operation, but failure through confiscation. The benefit that should come to the public is through the reduced cost of operation; but the value of the dismantled plant should not be taken from the books as a capital charge until such time through sale, or other equitable arrangement, such value has been amortized. So, too, with respect to the parallel lines in question. The commission valued these parallel lines at one-third of the value fixed by the engineers, $63,992, or $21,331. From a total valuation of $39,696, parallel and nonparallel lines, the appellant has a return in revenue of $11,000. These lines are useful for the present operation and for future development and they became very necessary in case of trouble with the other line. The reproduction cost should have been allowed as fixed by the engineers, $63,992, and the total

reproduction cost of the Monongahela system would
then be $82,357.

The commission declined to allow any sum for going
concern cost or value. While it said due consideration
would be given this item, its report expressly shows, in
the separate items found, nothing was allowed for going
value; in fact, the rate making value allowed was less
than the reproduction cost of the physical property.
The right of the company to have going value, or going
concern cost, assessed as a part of the present value for
rate purposes has been recognized by our own Supreme
Court. "As to the items of 'going value,' interest dur-
ing the period of construction, and the cost of repairing
the streets, which appellant contends were not allowed,"
the findings as to these items were correct, that they
were elements in that case: Monongahela Water Co.'s
Case, 223 Pa. 323; Turtle Creek Boro. v. Penna. W. Co.,
243 Pa. 401. " 'Going value,' or 'going concern value,'
i. e., the value which inheres in a plant where its business
is established, as distinguished from one which has yet
to establish its business has been the subject of much
discussion in rate-making cases before the courts and
commissions. That there is an element of value in an
assembled and established plant, doing business and
earning money, over one not thus advanced, is self-evi-
dent. This element of value is a property right, and
should be considered in determining the value of the
property upon which the owner has a right to make a
fair return when the same is privately owned although
dedicated to public use": Des Moines Gas Co. v. Des
Moines, supra; Public Service Co. v. Board of Public
Utilities, supra; People v. Willcox, supra. It takes
time, labor and money to bring a new operation into an
efficient working organization and to acquire a paying
business. The time and money expended in the pro-
motion of the enterprise, the cost of securing and retain-
ing customers, the loss of earnings on a reasonably well
developed plant during its initial years, when its busi-

ness is being built up, the increased value which comes from the consolidation of separate plants into one concern, these items, with the value that inheres in a plant with its business established, may be termed going concern cost or value. As stated above some authorities divide these costs into preliminary, developmental, or going concern. Good will, in the sense in which that term is generally used, or that element of value which adheres in the fixed and favorable consideration of custom, arising from an old established business, has no place in the fixing of values for the purpose of rate making of public service corporations of this character: Des Moines Gas Co. v. Des Moines, supra; Willcox v. Consolidated Gas Co., supra. Going value is to be distinguished from good will. "The difference between a dead plant and a live one is a real value, and is independent of any franchise to go on, or any mere good will as between such a plant and its customers. That kind of good will, as suggested in Willcox v. Consolidated Gas Co., 212 U. S. 19, is of little or no commercial value when the business is, as here, a natural monopoly, with which the customer must deal, whether he will or no. That there is a difference between even the cost of duplication, less depreciation, of the elements making up the Water Company plant, and the commercial value of the business as a going concern, is evident. Such an allowance was upheld in National Water Works v. Kansas City, 62 Fed. Rep. 853, where the opinion was by Mr. Justice BREWER": Omaha v. Omaha Water Co., supra. The appellant would have been entitled to a return on the value as adopted by the commission if it had just completed its construction and was ready to start business. It will not do, as argued by the appellees, to say that the item of going value was considered in the reproduction cost as returned by the engineers for the appellees. Aside from the fact that the engineers by their evidence excluded any such thought, it would be almost impossible to determine the going cost or value assessable to each factory compris-

ing the property. It is only by considering the property as an entire operating concern that we are able to reach any conclusion on this item. To take the familiar illustration of two plants identically planned, one completed, ready for business, the other completed and doing business, there can be no question but that the one doing business is more valuable than the one not doing business; and it is not correct to say that the first plant, without business, should have a junk, scrap or second-hand value. The same is true of companies just starting in business. The reason given by the appellees' engineers for not allowing any sum for going cost was that at the time the valuation was made the company had a paying business. This omits the theory upon which present value as aided by reproduction cost is found. It must include all the charges necessary to duplicate the plant, allowing present day prices for the cost of construction. The present value, in the case before us, includes nothing for developmental, preliminary or going concern costs, or value as herein mentioned. As it is a property right, the commission cannot vaguely consider it, but where it exists as here shown, it must be allowed. While it may be said that the assessment of this value is difficult, still, as said before, difficulties will not justify confiscation. The evidence does not show that excessive earnings were made, no dividends of any consequence have been paid by the company, and there were no excessive interest charges paid on borrowed money on the value fixed. There is no evidence of bad management in operation, nor is there any evidence that there was a surplus accumulated. There was sufficient evidence before the commission from which this value might have been included in the present value or rate making base. Considering the territory served, the number of miles of construction employed, the number of consumers already attached, the reasonable time within which the company should have accumulated a remunerative business, and the well

recognized difference between a plant that is doing business and one that is just ready to do business, and the added value which must come from consolidation, the lowest amount fixed by the appellant's evidence would not be an excessive value for this item. It bears a very fair comparison with the amounts allowed by commissions and appellate courts of other states. From the evidence, the commission should have fixed a value for this item. We are not impressed with the table of theoretical surplus. As a matter of fact, there was no surplus. The table might be useful in showing what the earnings should have been had a proper return been made. It might thereby assist in determining going value. The commission did not consider it and we need not.

The amount ascertained for engineering and contingencies is substantially correct. While it might be increased a trifle, the difference is not so large as to warrant any revision.

Interest during construction was allowed, but exception is taken to the reduced amount for the reason that the estimated time within which the plant should have been completed was reduced by the commission. The experts for both sides, whose agreement on many items had been accepted by the commission, found that the time necessary to construct the plant would be two and one-half years. The money used to construct the plant, as the labor employed thereon, demands its fair return from the moment it leaves the investors', hands. During the period of construction, the company secures no return for its use. The interest charges must be met and this can only be done from capital account. Those who have practical knowledge as to the time necessary to construct a plant of the magnitude of the one under consideration, are properly qualified, and perhaps in a better position to determine the time, than lawyers or judges without practical experience. The engineers agreed that two and one-half years was a reasonable

time, and this agreement should have been accepted, unless the commission had other information or other evidence from which to curtail that time. The appellant was entitled to the additional year's interest at the rate found by the commission.

Concerning the item of brokerage, the courts and commissions of other states have held that discounts on securities should be allowed; as utilities, like other companies, are not able to make their financial arrangements without allowing such discount. The difference between the amounts derived from the sales of its bonds and the amount which the company must eventually pay on the bonds has been regarded as a part of capital charge for construction. While corporations should not be permitted to capitalize their lack of credit, still, where bonds are sold at a reasonable discount and bear a fair rate of interest, such discount should be allowed. What is a fair discount depends upon the condition of the money market and the ability of the organizers to attract capital to the project. It is a well known fact that the great majority of companies are started without all the available cash necessary to complete the undertaking. This country would not have reached its great stage of industrial development if it had been the rule that all capital must be procured in advance by fully-paid stock subscriptions. If a legal rate of return was all that was offered, the investor could very well answer that without risk and, with a safe margin of value, money could be loaned on lands and buildings at this rate of return. When solicited to invest in a new project, with the uncertainty of success before him, the investor demands a return commensurate with the risk involved, and that must be something more than a legal rate investment. If the venture is a failure, the investor is compelled to take his loss without any hope of recoupment; but it is equally unfair to require him to suffer all the loss if the enterprise fails, and to deprive him of the chance of additional gain if the venture is a success-

ful one.   Moreover, the company should be allowed the expense necessary to afford the inducement to capital, and if to secure capital it is necessary to give a reasonable discount on bonds (and this has been the rule in the past), such discount should be allowed as a capital charge.   To hold that only the cash received may be considered in a rate making value, would not only deprive the company of property, but would deprive the investor of property; it would drive from the field of legitimate banking the securities of hundreds of utility companies within the State.   Many of these securities are held in good faith by banks throughout the Commonwealth. We cannot view the present success of utility companies as the medium through which this question must be judged.   It is necessary to go back to their formative period, when these securities were sold, and from that viewpoint examine the various critical stages through which the utility company has passed.   It has only been through inventive genius that many utility concerns have become successful ventures.   The appellant should be allowed a certain per cent. for brokerage, or discount. There was sufficient evidence before the commission to determine the fair amount and while the company, in undertaking to allow exorbitant amounts, fell into error, and such issues were clearly unreasonable and grossly in excess of any fair demand, still we cannot deny to the innocent stock and bondholder the justice of securing a reasonable allowance for brokerage as a capital charge.   In so doing we do not give any consideration whatever to inflated or fictitious values; the evidence before the commission was that seven and one-half per cent. of the reproduction cost would be a fair amount.   When based on reproduction cost, the discount is limited to actual value and no fictitious charge is allowed as it would be if calculated on an issue of stocks and bonds where the utility was created solely from the money received from the sale of bonds.   This for a new concern does not seem unreasonable.

In fixing a schedule of rates that would produce a return on plant value mentioned in going cost, three ways have been suggested by the authorities: First, to make the rates so high that these items would be returned to the investors from the first years of the business. This, it is readily seen, would cause a prohibitive rate to be fixed. Second, to distribute the cost over a given number of years and gradually amortize it. This, while fairer to the public than the first proposition, is not as satisfactory as the third one, which seems to be adopted by most authorities. Third, to treat these costs or values, as well as the other items of plant value, as a capital charge for the purpose of fixing a fair rate to the public. These questions must be determined from the principles of sound business, with an equal appreciation of public interest. It may be that future business, from the schedule of rates now fixed, may demand a further regulation, the increase of business having such tendency. This is one of the consequences that follow adjustment of rates. So, too, if it is made apparent to the commission that items of value have been omitted from the testimony, the commission under its broad powers may cause such action to be taken that will permit a return thereon.

The order of the commission is reversed and it is directed to reform its valuation in accordance with this opinion and upon such valuation it shall fix a schedule of rates which shall cover the expenses, depreciation, etc., and the return per cent. as found by the commission to be fair.