Scranton-Spring Brook Water Service Company et al., Appellants, *v.* Public Service Commission.

Argued October 15, 1934.

Before TREXLER, P. J., KELLER, CUNNINGHAM, BALD-
RIGE, STADTFELD and PARKER, JJ.

*Berne H. Evans,* of *Hause, Evans, Storey & Lick,*
with him *Allen S. Hubbard, William M. Wherry,* of
*Wherry & Wight,* and *Russell H. Neilson,* for Scranton-
Spring Brook Water Service Company, appellant.

*Joseph F. Gunster* and *Harold Evans,* with them

*Charles N. Loveland, Edwin B. Morgan* and *William H. Gillespie,* for City of Wilkes-Barre and City of Pittston, appellants.

*Charles M. Bowman,* for Citizens Protective League, appellant.

*Paul H.. Rhoads,* with him *Samuel Graff Miller, E. Everett Mather, Jr.,* and *John Fox Weiss,* for Public Service Commission, appellee.

OPINION BY KELLER, P. J., October 2, 1935:

These appeals arise from one record and were argued together. They will be disposed of in one opinion. The record is monumental in size. When it first came into this court (See Scranton-Spring Brook Water Service Co. v. P. S. C., 105 Pa. Superior Ct. 203) it consisted of 4,000 pages of printed testimony and fourteen large quarto volumes of photostatic exhibits. On these appeals it has been increased by 1,100 pages of printed testimony and five additional quarto volumes of photostatic exhibits, taken pursuant to interim reports of January 3, 1933 and February 7, 1933, respectively.

When the legislature, by the Act of June 12, 1931, P. L. 530, imposed on this court, in every appeal involving the .reasonableness of rates, the duty "to consider the entire record of the proceedings before the Commission, including the testimony, and on its own independent judgment, to determine whether or not the findings made and the valuations and rates fixed by the Commission are reasonable and proper," it made no provision for supplying this court with a staff of engineers and force of accountants such as is possessed by the Public Service Commission and used by it in making its findings, and consequent calculations leading up to a rate base valuation and rate schedules. Our

duty is only to determine whether the findings made and the valuations and rates fixed by the Commission are reasonable and proper or unreasonable, and if the latter, we are not to reform them ourselves, but are to "remit the case to the Commission with directions to reform the findings, valuations and rates in accordance with the court's opinion." It is necessary then, in order that we may perform the statutory duty thus imposed upon us that the report of the Commission in such a proceeding should be as full and complete as possible and should furnish us with the data used by it in arriving at the findings made, and the fullest information possible as to the base figures, quantities, prices and mathematical calculations adopted in fixing the value of the public service company's plant, used and useful in the public service, for use as a rate base, and in preparing the rate schedule directed to be established by the company as reasonable and proper, and the processes and methods by which the Commission reached its findings and conclusions on the evidence.

It was the lack of this full and complete data and information in the original report of the Commission which necessitated our sending it back to the Commission, to supply us with the material necessary in order to permit us to exercise our independent judgment on the findings made and the valuations and rates fixed by the Commission. It is not necessary, again, to point out the deficiencies, in these respects, in the original report, nor to restate the facts involved, except as they are affected by subsequent events. They are stated in some detail in our former opinion in this case. See 105 Pa. Superior Ct. pp. 206-228.

That opinion was filed on May 4, 1932. Instead of supplying us with the information asked for, which should have been readily available if the results as embodied in the report had been based on mathematical

calculations, the Commission, after various delays and attempts at compromise and settlement between the parties interested, which proved successful as to the Scranton—as distinguished from the Spring Brook or Wilkes-Barre—district or field of operations, on June 19, 1934, filed a report and order, in line with its interim reports of January 3, 1933 and February 7, 1933, dividing the time between the effective date of the tariff complained of, July 1, 1928, and the date of its report and order, June 19, 1934, into three periods, to wit, (1) from July 1, 1928 to December 31, 1930; (2) from January 1, 1931 to June 30, 1933; and (3) from July 1, 1933 onward; and ordered the water company to file three new tariff schedules: The first, effective from July 1, 1928 to December 31, 1930, designed to yield, in the Spring Brook district, as to which no amicable adjustment could be made by the parties, a gross annual revenue as of July 1, 1928, not in excess of $1,737,372; the second, effective from January 1, 1931 to June 30, 1933, designed to yield, in said Spring Brook district, a gross annual revenue, as of December 31, 1931, not in excess of $1,737,517; and the third, effective from July 1, 1933 and for the future, designed to yield in said Spring Brook district a gross annual revenue as of January 1, 1934, not in excess of $1,610,268. The Commission took this course, as to some extent outlined in its interim report of January 3, 1933, because of the changes in economic conditions which it found to have taken place between the effective date of the tariff schedule under attack and the date of its second report and order. The additional testimony and exhibits which are now before us represent evidence taken relative to these changes in economic levels and conditions.

We are of opinion that the Commission should have done what it was directed by us to do, viz., referred to its data and made a prompt supplemental report to

this court supplying the deficiencies of information to which we had called attention, together with such changes and modifications in the findings as we had made in the exercise of our independent judgment, and thus have arrived at a new rate base valuation (with a permissible revenue yield, under a proper tariff rate), which incorporated such changes as we had said should be made, based on a report which would allow us to examine into the other matters complained of by the several appellants and determine whether they were sustained by the evidence; or if unable to do so fully, return the record to us with the information available and the reasons why the rest could not be furnished, and we could then have disposed of the appeals in the light of the information so furnished. We shall not reverse on this ground, however, for the effect would only be to cause needless delay over a matter of procedure, not definitely established by rule and as to which some misunderstanding may have existed. Instead we shall consider the new appeals by the respondent company and the various complainants and intervening appellants in conjunction with the appeals still pending from the prior report and order, in so far as they are not affected by the discontinuances hereinafter referred to, so that without technicality of procedure the questions involved may be disposed of as promptly as possible. By leave of court, the appeals pending from the original order of the Commission were, on June 22, 1933, discontinued in so far as they applied to or affected the valuation, revenues, expenses or other matters within the Scranton Division of the Scranton-Spring Brook Water Service Company. The appeals were orally argued on October 15, 1934, but supplemental briefs, reply briefs and counter-reply briefs were filed, by leave of court, as late as February 15, 1935, and by the Citizens Protective League, intervening appellant, on June 22, 1935, over two months

after the date allowed for filing such reply brief, April 12, 1935. Some of the briefs filed have gone outside the record in the case and referred to testimony not taken before the Commission, in proceedings forming no part of this case. We are confined and will limit our discussion to the evidence in the record.

The second report and order of the Commission was filed on June 19, 1934. It comprises four hundred and sixteen printed pages. It is a painstaking, carefully prepared, detailed report, which supplies much information not given in the first report. It shows on its face that much time and care have been given to its consideration and preparation. Criticisms as to its lack of detailed information are not justified. We did not intend, in our prior opinion, to rule that every piece of pipe, every fitting, and every tract of land must be separately itemized and valued. Such a course would not be feasible or practicable. Having arrived at a fair measure of value for an item of property, it can be applied to other items similarly placed and bearing a relation which justifies approximately the same valuation. Seven years have passed since this litigation was started and it should be brought to an end as promptly as is consistent with a fair and reasonable determination of the issues involved. There are, however, certain errors of approach and treatment present in the second report of the Commission, which are of such moment and importance in their potential results, as to require us to reverse the order and send the report back to the Commission for correction and revision in the light of our discussion.

(1) In our former opinion, (105 Pa. Superior Ct. 203, page 217) in discussing the base rate to be applied in valuing cast iron pipe, which the Commission fixed at $38 per ton, with proper increases for smaller sizes and weights of pipe, we said: "Upon a review and consideration of the evidence on both sides, and

having regard to the admissions of witnesses for the company, our independent judgment is that the basic rate for pipe should be $36.25 per ton." The Commission rightly interpreted this as a distinct finding by this court, as a result of the exercise of its independent judgment, that the basic rate for cast iron pipe as of July 1, 1928, should be $36.25 per ton; but there is nothing in this statement which is equivalent to a ruling by this court that the testimony of any witness called by the respondent constituted an *admission by it,* or that established any *policy* on the part of this court that the Commission should adopt, in case of difference between witnesses for complainant and respondent respectively, the lowest figures testified to by any witness for the respondent. The Commission, however, mistakenly *applied* such a fancied and supposititious 'policy,' and, in consequence, went basically wrong in arriving at its conclusions of value. It will not do for the learned counsel for the Commission to disclaim any such course on the part of the Commission. The report itself is too clear for misunderstanding. For example, on page 4220a, the report reads (italics ours): "Following the *policy established by the opinion of the court in the matter of pipe prices, regarding admissions by respondent's witnesses,* we accept the Harrop prices as an *admission on the part of the respondent* that the work would be done for these prices on a 50 cent per hour common labor wage rate, even though the prices are materially below the actual experienced costs shown for the Watres-Gardners Creek line, and for the Plymouth line adjusted to a 40 cent labor rate." On page 4082a, we read: "We have, however, developed a total reproduction cost of all structures by selecting the least value testified to by either of respondent's witnesses, ...... for each separate structure." On page 4321a, "...... having in mind the decision of our Su-

perior Court in this case, regarding admissions by respondent's witnesses, the Commission allows 4% of all preceding items," etc. Page 4104a: "Here again, the item is small, and *complainants* have allowed a unit price of $180 per M board feet as against $150, the lowest price set by respondent's witnesses. Ehlers, for the respondent, set a price of $244.10 per M board feet adjusted for overhead. We accept respondent's low unit price." Page 4114a, "This price is the *lowest* price used by *complainants* in any instance and is in agreement with the price set for this reservoir in respondent's Winston [lowest] appraisal." Page 4116a: *"On the basis outlined in the opening statement,* (italics ours), the Commission accepts Ehlers' unit price [the lowest]. Page 4120a: "We allow the quantities at the lowest unit cost testified to by respondent's witnesses." Page 4127a: "We are here considering quarrying for a high grade of masonry, and adopt respondent's lowest price of $3 per cubic yard." Page 4179a: "Respondent's appraisal by Harrop shows a total of $19,170; Ehlers [for respondent] $24,448; and complainants' $20,360. We accept $19,170." Page 4232a: "Following the policy outlined in discussing Account No. 208, the Commission accepts $4.23 per foot [respondent's lowest] or a total of $6,119." Page 4233a: "Following the same consideration as before, the Commission accepts the respondent's low estimate of $18,598." These are a number of instances culled out of the report. They bear intrinsic evidence that the Commission wrongly interpreted our statement above quoted as a ruling that testimony by a witness for the respondent constituted an *admission by the respondent,* and as indicating a policy adopted by this court that the Commission in arriving at its judgment in a case of disputed values should accept the lowest unit price testified to by any witness for the respondent. We made no such ruling

and we enunciated no such policy, and nothing in our former opinion justifies any such conclusion. It may be, that in some, or even in many, instances the Commission adopted respondent's lowest unit figures because they corresponded to the Commission's independent judgment on those items; but certainly they did not do so in all instances; and we are entitled to the free and untrammeled judgment of the Commission freed of any erroneous conceptions as to the rulings and policy of this court.

(2) On page 217 of our former opinion (105 Pa. Superior Ct.) we said: "With regard to labor costs the Commission said: 'Respondent contends that a base price of 50 cents per hour for common labor should be used in all calculations involving labor costs; complainants' corresponding figure is 40 cents. Considerable testimony appears of record as to prevailing prices for labor in the Lackawanna and Wyoming Valleys over a period of years as paid by municipal authorities, individuals, contractors and others, including this respondent.' This is merely a statement of the contentions of the parties and there is no finding with respect to the rate per hour adopted by the Commission. It is asserted in the cities' brief that 'the Commission used 50 cents as its cost for ordinary labor.' In the absence of any distinct finding we cannot assume the correctness of this statement; but, if the Commission did use that rate, our judgment, after reviewing the evidence on the subject, is that it was too high."

In the second report the Commission used 40 cents as its average cost for ordinary labor, applicable to the schedule under consideration for 1928. On further consideration of the evidence, having regard to the testimony of the witnesses for both complainants and respondent, we are of opinion that the average base price for common labor, to be used in calculating reproduction costs for the period 1928 to December 31, 1930,

should be 45 cents per hour instead of 40 cents. This, of course, does not apply where the construction was so close to 1928 and the conditions so similar (See Watres Reservoir (4174a); Watres-Gardner's Creek Line (4228a); Plymouth Tunnel (4250a)), as to lead the Commission to adopt the actual cost of construction, less depreciation, instead of the reproduction cost, less depreciation, as the present fair value of the structure being appraised. See Clark's Ferry Bridge Co. v. P. S. C., 108 Pa. Superior Ct. 49, 165 A. 261, and the same case in 290 U. S. 632. In such cases, the actual cost should be used, rather than a theoretical cost, in the absence of evidence that such actual cost was exorbitant. The Commission will apply this base rate of 45 cents per hour for common labor to the other two periods in accordance with the trends of prices. We do not disagree with the Commission's finding that the fair average wage scale for masons in work of this character was $1.00 per hour.

We agree with the Commission that in arriving at a fair and reasonable valuation of respondent's property for rate making purposes the base price for common labor should not be fixed at the 'distress' prices for which labor was sporadically obtainable during the extreme depth of the depression. Men should not be asked to work on regular jobs for the meager wages which in times of long continued scarcity of employment they are willing to take to keep body and soul together; nor should a public service company's plant be valued on any such basis. Complainants' engineers recognized this when in making their valuation they selected, not the lowest rate which was sporadically obtainable, but 40 cents, which they alleged was a fair average rate. The necessity for this course is readily seen, when consideration is given to the fact that, even in the nadir of the depression, strikes and labor troubles over low wages became frequent and interfered with

full recovery whenever conditions showed any substantial improvement, with a prospect of regular steady employment on a considerable scale. The very undertaking of reproducing a plant of this magnitude, requiring a large supply of common labor with steady work over a considerable period of time—(estimated at six years) —would of itself result in an increase of the basic wage rate to a reasonably fair and adequate return for such labor. The Commission committed no error in taking this fact into consideration.

(3) In arriving at the quantities of pipe, to which were to be applied the basic price per ton of pipe and the rate per hour for common labor, in fixing the valuation of the pipe in the ground, (See 105 Pa. Superior Ct. pp. 216, 217) the engineers of the complainants and respondent could not agree on the figures. The Commission's method of determining the correct figures as between these opposing forces was novel but not satisfactory. As the burden was on the respondent it presented its case first. Presumably it furnished the Commission all the information available to it or which it had been able to secure. The engineers for the complainants were then heard; and following this, the Commission, instead of checking the figures with its own engineering force, by going over the maps which the engineers had used to calculate the quantity of pipe laid, or determining in some other way which witness was correct, seemed to think that there was some rule of law which required it to accept the testimony of the side last heard—in this case, the complainants—unless the respondent produced evidence in rebuttal. This is evident from a reading of pages 4185a to 4189a. There is no such rule of law. Wherever measurements were made by scaling a map, and the engineers for the several parties differed in their measurements, the Commission could arrive at the correct figure by having its own engineering force go over the measurements.

Where the quantity cannot be ascertained by scaling the maps the Commission should determine which figure should be accepted, by some course other than deciding in favor of the complainants because "there is no rebuttal testimony by respondent."

(4)  We agree with counsel for the City complainants that the 'constants' or 'differentials' used in order to make Engineer Ehlers' prices comparable to those of other witnesses should be 1.21 and .95238 instead of 1.2205 and .96065 respectively as used by the Commission.  See Report pp. 4090a, 4091a.

These changes or adjustments will be reflected in many items entering into the calculation of the fair value of respondent's property used and useful in the public service, and may serve to correct certain inconsistencies in the report, such as the Commission's reproduction cost for fire hydrants, which was less than the lowest estimate of the witnesses for complainants or respondent.  There are, however, other items not greatly affected by them, as to which we will express our independent judgment, to the end that, with the corrections and readjustments hereinbefore referred to carried into effect by the Commission, this long-drawn out litigation may be brought to a close.  These items we will now take up and give the conclusions which we have reached representing our independent judgment with respect to them.  They can be applied by the Commission to the results of their revision of the report as before directed.

## Real Estate, Including Water Rights.

The present report is not justly subject to the criticism directed against the prior report of the Commission on this subject.  It contains a full and detailed description of the lands involved, covering over forty pages, a discriminating discussion of the valuations placed on the land by witnesses for the respective par-

ties, with the reasons moving the Commission to adopt the valuation of the complainants, or the respondent, or a figure in between, as to the property under consideration. The total valuation arrived at by the Commission was $1,196,198, for all the land found to be used and useful, considered in connection with its use for water supply purposes; as over against respondent's land appraisal of $1,365,720, and complainants' appraisal of $360,086. Complainants' claim that the Commission's figures were incorrectly totalled was due to their own mistake in omitting Kingston Township lands $11,050, and in entering the lands in Dallas, Jackson, Lehman and Plymouth Townships at $437,767, instead of $437,766, a net error on their part of $11,049. Our review of the testimony in connection with the Commission's discussion of it leads us to agree with them in the main and subject to corrections, if any, under the first item of error discussed in this opinion, to adopt their figures as the just, fair and reasonable valuation of the respondent's lands used and useful in the public service, and as representing its fair market value for all its available used and useful purposes, including any peculiar value or special adaptation that it may have for water supply purposes. This is in accord with the rule laid down by Chief Justice HUGHES in the Minnesota Rate Cases, 230 U. S. 352, 451, and applied by Mr. Justice KEPHART, when a member of this court, in Ben Avon Borough v. Ohio Valley Water Co., 68 Pa. Superior Ct. 561, 582, 583. See also, Clark's Ferry Bridge Co. v. P. S. C., 291 U. S. 227, 238. The Commission calls attention to striking errors in computation on the part of the complainants (1) in considering the value of land conveyed to respondent or its constituent companies, at the nominal consideration stated in the deed—one dollar—rather than the actual amount paid, and (2) in valuing farm lands bought to preserve the water supply from contamination and

thereafter devoted to woodland, as 'raw' lands instead of as improved or tillable lands. On this latter point the Commission pertinently say: "Complainants definitely state that they valued the land as 'raw' land, grown up to brush even though it was bought originally as cultivated farms. The complainants in thus setting their values have ignored one of the fundamental elements affecting value. They have based their figures on what the land would be worth in its present condition for office sites, home sites, farm lands, timber land or wild land, omitting the fact that most of this land has a specific usefulness in the water service now being rendered by respondent, entirely distinct from its use for any other purpose. The exercise of engineering judgment has determined that this respondent should acquire these lands in preference to the construction and operation of filtration plants so that a potable source of supply could be had without resort to mechanical treatment. If the price of these lands was too high, then the engineering judgment would change in favor of the use of modern methods of purification through filtration thus largely avoiding the necessity for ownership of these lands. The determination of value of such lands for water company purposes is more than a question of the value placed upon these lands for the more common farming or residence purposes with which the real estate expert is generally familiar. So long as the engineering judgment in the design of this plant and system for supplying water indicates the purchase and acquisition of these lands in lieu of other methods of accomplishing like results, then the values set by the real estate appraisers can be considered only as fixing a minimum limit of value for such lands. The value of these lands to the water company was sufficiently in excess of the value for other purposes so that the water company could actually buy up these lands as going farms and later return them

to a more or less wild state, as they better serve the purposes of the water company in that condition. The water company is entitled to hold these properties at a value sufficiently high to assure that these lands will be held for the public service, to which they are now dedicated against any and all uses which might reasonably be expected to compete for the occupancy of such land. In addition to land values above discussed, there is the value of water rights, meaning thereby the right to divert water against riparian rights of other land owners. The Commission rejects complainants' contention for appraisal of this property as raw land and without regard to its condition at the time of actual purchase." And counsel for the Commission in their supplemental brief well say: "When a water company develops a water shed system it is necessary to have contiguous lands in order to protect the quality and purity of the water. If the company owned one tract here and another there, with private persons owning and living on intervening tracts from which the water company collects its supply of water for public consumption, the company could not adequately control the drainage of the water from the tracts which it did not own. In order to have one contiguous tract, therefore, it was frequently necessary for this company to buy going farms and reforest them or return them to their natural state of wild growth. *Any other policy than this would tend to dissuade a water company from buying up going farms and cultivated tracts which, in fact, they must do if they are going to protect, properly and adequately, the quantity and purity of the water supplied to the public. Having purchased those lands as cultivated lands, their market value as such should be one of the elements used in computing market value for purposes of making an appraisement in a rate case.*" The principle involved is somewhat analogous to a hydro-electric company, which in order to erect its dam

is obliged to buy fertile farm lands on islands in the river, or bordering upon it, which will be flooded by the waters impounded by the dam. The prices paid for these lands, if not exorbitant, properly enter into the valuation of the used and useful property of the company.

This disposes, also, of the claim of respondent, based on the testimony of its witness, Fuller, that by combining the separate tracts purchased for water supply purposes into one and operating the whole as a unit, four million dollars was added to the value of the respondent's property, on which it was entitled to a seven per cent annual return to be paid by the consuming public, but which it generously split in half, making claim in this respect for an added value of only two million dollars. The value of the land for all available purposes, including water rights and water supply, has been considered and fixed by the Commission. To value separately, in addition, any item entering into the consideration of such appraisal would be a duplication of values to which the respondent is not entitled. "The owner would not be entitled to demand payment ...... of an increase over its fair market value, by reason of any added value supposed to result from its combination with the tracks acquired from others so as to make it a part of a continuous railroad right-of-way held in one ownership": Minnesota Rate Cases, 230 U. S. 352, 451, 452. Besides, we are not impressed by the testimony of the witness. He added an arbitrary 25% to the physical value of the supply plant as appraised by respondent's engineers. He might, with just as much reason, have added 50% or even 100%. It is fantastic estimates of this type which tend to discredit the worth and reliability of 'expert' testimony in rate cases. A somewhat similar claim for value of 'location' was considered and excluded in the Clark's Ferry Bridge case, supra. Respondent's claim for $200,000 for reforestation

was also properly excluded by the Commission, for their report shows definitely that reforestation was considered and included in the determination of 'real estate' values.

### Overhead Costs.

Here again the present report is free of the errors and inconsistencies pointed out in our opinion dealing with the first report, (105 Pa. Superior Ct. 203, 218, 160 A. 230). The percentages allowed for overheads [1] in the report are fair, reasonable and supported by evidence. See Ohio Utilities Co. v. P. U. Com., 267 U. S. 359, 362. No error was committed in including the real estate when computing the 'engineering and supervision' and 'interest during construction' costs. Engineering assistance is needed to determine the necessity or advisability of securing the lands for the purposes of the water plant and the proper lay-out of the system; and money must be expended in the purchase of the lands before any works or impounding and distribution systems can be started. The action of the Commission in thus including the real estate when computing the engineering costs and interest during construction is supported by Ben Avon Boro. v. Ohio Valley Water Co., 271 Pa. 346, 354, 114 A. 369: Elizabethtown Gas Light Co. v. P. U. Commrs., 95 N. J. L. 19, 111 A. 729; Mamaroneck v. N. Y. Interurban Water Co., 212 N. Y. Supp. 639, and other cases. We may add on this general subject that the complainants cannot here properly object to the inclusion of overhead cost items which their own engineers in arriving at the valuation of respondent's property included as part of the rate base.

We consider the commission's allowance for working capital, $80,000, in connection with additional allow-

---

[1] Omissions and contingencies, 3%; engineering and supervision, 3%; organization and promotion, administration, general and legal, insurance and taxes during construction, 2.56%; interest during construction, 3.78%; cost of financing, 4%.

ance for materials and supplies on hand, $100,000, to be adequate, fair and reasonable.

When the prior report of the commission was before us we said on the subject of allowance for going concern value: "The item of going concern value is on a somewhat different footing. We have treated this subject at some length in City of York v. Pub. Ser. Com., 85 Pa. Superior Ct. 139, 142; Newport Home Water Co. v. Pub. Ser. Com., 76 Pa. Superior Ct. 386, 395; Ben Avon Borough v. Ohio Valley Water Co., 68 Pa. Superior Ct. 561; Beaver Valley Water Co. v. Pub. Ser. Com., 76 Pa. Superior Ct. 255, 269, and other cases, and need not repeat what is there said. Unlike the other intangibles allowed, it is not wholly a theoretical matter, but must be supported, when allowed, by evidence of an actual lag in the early years of business, which should be allowed for in arriving at the rate base. When that evidence is furnished, calculations are then in order to determine as nearly as possible the present allowance for such developmental cost. As President Judge TREXLER said for this court in City of York v. Pub. Ser. Com., supra (where we disapproved any allowance for going concern value), 'Some corporations have years of tedious waiting until they get on a paying basis; others have an immediate public demand and a profitable return as soon as started. Some fact must disclose to which class the particular corporation under consideration belongs. Before we figure going concern value, we should have such evidence that there was a lag before the business became established.' In this case the company produced no evidence whatever of any lag in building up its business. The cities on the contrary produced evidence that the water companies combined in the present system were unusually successful from the start, with no lag in business or period of waiting until they got on a paying basis; that, starting with small capital invested, the earnings were so great

and so immediate that the present great system had been built up out of such earnings put back into the business, after the payment of generous dividends. In the absence of any evidence as to an actual or historical lag in the building up of business, the calculations of the company's engineers, based wholly on a theoretical lag, are insufficient to support an allowance for 'going concern value,' and the report of the Commission, beyond the general statement that it has given consideration to the conditions to be met in the construction of such a property in the territory in which the company operates, presents no sufficient basis for the allowance of $2,600,000." A further review of the evidence does not lead us to a different conclusion. Since that opinion we have had occasion to consider the subject of allowance for going concern value in reproduction cost valuation in the case of Chambersburg Gas Co. v. P. S. C., 116 Pa. Superior Ct. 196, 176 A. 794, where our Brother PARKER has made a most thorough examination into and review of the subject, and distinguishes that case on its facts from this one. It is not necessary to lengthen this opinion by incorporating into it what Judge PARKER has so well said on the subject, but we rely upon it the same as if herein recited. Bauer & Gold in their work, 'Public Utility Valuation for Purposes of Rate Control' published by the Macmillan Company in 1934, review the decisions of the Supreme Court of the United States [2] on the subject of 'Going Concern'

---

[2] Including, Willcox v. Consolidated Gas Co., 212 U. S. 19; Cedar Rapids Gas Light Co. v. Cedar Rapids, 223 U. S. 655; Louisville v. Cumberland T. & T. Co., 225 U. S. 430 (case below, 187 Fed. 637, 646); Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165, 166, 171; Denver v. Denver Water Co., 246 U. S. 178; Galveston Electric Co. v. Galveston, 258 U. S. 388; Houston v. Southwestern Bell Co., 259 U. S. 318, 325; Georgia Ry. Co. v. R. R. Commrs., 262 U. S. 625, 632; McCardle v. Indianapolis Water Co., 272 U. S. 400; Los Angeles G. & E. Corp. v. R. R. Commission, 289 U. S. 287, 313-14-15-16-17; Dayton P. & L. Co. v. P. U. Commission, 292 U. S. 290.

or 'Going Value,' (pp. 301 to 337) and summarize the applicable principles resulting therefrom, as follows: "A utility must be valued as a going concern. If, however, the properties have been otherwise appraised on a reasonable basis, if proper overheads were duly allowed, and if in all the prior determination there was recognition of the fact that there is a functioning organization and connected clientele, the valuation will be upheld even if no separate allowance has been made for going value. If a company claims an additional amount for going value, it is required to establish its claim by more than unsupported opinion, hypothetical calculations, or conjecture. It must present concrete evidence of its actual experience. It cannot rest upon assumptions that have no basis in solid facts. Nor can it claim past losses or capitalized earning power, or past charges properly included in operating expenses. ...... The practice of commissions to make an over-all percentage allowance for going value results practically in granting the companies a surcharge above investment or reproduction cost of the properties. It becomes a bonus pure and simple. As new properties are installed, their cost is automatically augmented in the rate base by the percentage addition for going value. This establishes a basis of return that does not rest upon any cost or sacrifice on the part of investors. It has no basis in economics or in law as construed by the Supreme Court. It constitutes rank imposition upon the public and cannot be called in any sense 'fair value.' "

### Depreciation—Accrued and Annual.

The Commission has in this report explained with some detail the method used by it in arriving at its figures for accrued depreciation. We quote from the report (p. 4036a): "We have selected from the record these estimates of expected life of the respective units

based upon the demonstrated knowledge of each witness as to the past conditions of service of the items under consideration, the present physical condition of those units determined from adequate field inspection, the possibility of continued usefulness in the public service or any and all elements which would affect the ability of the unit to continue to render a satisfactory public service. The actual selections made and the reasons therefor will be shown in each accounting subdivision. Because of the character of this record, the Commission has followed the age-life method of determination and computed allowances for depreciation on the 4% sinking fund basis. This allowance is an estimate based on the most credible facts of record and represents the accrued depreciation which should have been set up at the date of the appraisal considering all of the units of the plant to have been constructed at the time and under the conditions existing at the actual date of construction, but at prices current as of the date of appraisal. The extent to which this item of accrued depreciation will affect the determination of rate base is considered later under Fair Value. The same elements discussed herein are used in determining the reasonable annual allowance for depreciation in that part of the report dealing with proper operation expenses." It discussed the results in connection with the testimony of the engineering witnesses for respondent and complainants (pp. 4329a-4335a) and arrived at a reproduction cost new as of July 1, 1928 of $18,343,-647 and reproduction cost new less accrued depreciation of $17,292,584, making accrued depreciation $1,051,063. The comparable annual depreciation allowed was $86,500. These figures will, of course, be affected by the changes made necessary by this opinion; but in the method and principle used we find no reversible error. It supplies what was lacking in the last report and is not open to the objection then made.

Operating Expenses.

The respondent calls to our attention the cases of West Ohio Gas Co. v. P. U. Commission, 294 U. S. 63, and 294 U. S. 79, which were decided since the argument of this case and dealt with the action of the Public Utilities Commission of Ohio in reducing the operating expenses allowed the gas company and in making no allowance for expenses of the rate litigation. As the case must go back to the Commission they will review their action on operating expenses in the light of these decisions. We think, however, that there is a clear distinction between the facts in those cases and in this one. As we understand it the Commission's allowance for operating expenses in this case was sufficient to cover all expenses paid by the respondent prior to embarking on the course which led up to this litigation. It rejected an annual management fee of $79,487.70 claimed by the holding company which controls the respondent, stating that "Respondent has not shown that these additional managerial costs resulted in any increase in the efficiency or economy of service" and allowed instead "the salaries paid for these duties during the period prior to the acquisition of this property by the Federal Water Service Corporation in the amount of $40,600." The total allowance for operating expenses was $347,828. Management fees charged against a public service company by the holding corporation in control by virtue of its stock ownership, is in a somewhat different position from ordinary operating expenses. The relation between the companies warrants the Commission in giving close scrutiny to and requiring adequate proof of the benefit or advantage accruing to the public service company, and in turn to the public, by the management contract, which the Commission found wholly lacking in this case. We considered the matter along this line in Chambersburg Gas Co. v.

P. S. C., supra, and are not satisfied that we were in error in so doing, or that our position is in any respect in conflict with the United States Supreme Court cases just cited. See Dayton Power & Light Co. v. P. U. Commission, 292 U. S. 290, 307. In the light of the pronouncement of the Supreme Court of the United States in the West Ohio Gas Company cases, supra, the contention of the complainants that the sum total allowed for salaries of general officers (President, Vice President, General Manager, Secretary, Treasurer, Comptroller, and General Auditor) of a corporation of this size should be reduced $25,000 below the amounts actually paid, to slightly more than $15,000, does not merit extended discussion. See Report p. 4339a. As to the amortization of rate litigation expenses, there is no similarity between the West Ohio Gas Company cases and this one. In those cases the municipal authorities of Lima and Kenton respectively passed ordinances fixing the rates to be charged by the gas company. The gas company filed complaints with the Public Utilities Commission, which after hearing found the ordinance schedules to be insufficient, unjust and unreasonable. In the present case the initiatory action was taken by this respondent which filed a tariff schedule raising its rates, to an extent found by the Commission to be excessive and unreasonable. The difference between expenses incurred in defending against an insufficient and unjust schedule rate attempted to be put into effect by municipal action against a public service company and those incurred in an attempt to establish an excessive and unreasonable rate schedule upon the public is easily seen. In the former, the public may properly be required to bear the expense incident to the company's defense; in the latter, there is no reason why the litigation expenses caused by its own unjust and unreasonable action should be saddled upon the public. We are still in accord with what we said in our opinion

in 105 Pa. Superior Ct. p. 227: "The company in its appeal complains of the refusal of the commission to make allowance, in fixing the rates to be charged, for the expenses of this rate case, amortized over a period of five years. Whether such an allowance should be made or not will depend largely on the final outcome of the litigation. If the company's schedule of rates, as filed by it, is substantially sustained, allowance should be made for the reasonable expense—not necessarily the actual outlay—to which it was put in order to uphold it. On the other hand, if the schedule filed is decided to have been substantially greater than the just, fair and reasonable rates it was entitled to charge, there is no reason why the public should be asked to bear the expenses of the litigation brought on by its filing a schedule of rates found to have been greatly excessive." See also, City of York v. P. S. C., 85 Pa. Superior Ct. 139, 141, 142.

### Rate of Return.

As before stated, due to the marked difference of conditions between July 1, 1928, the effective date of the respondent's tariff complained of, and June 19, 1934, when the present report and order were filed, the Commission divided the time between into three periods, to wit (1) from July 1, 1928 to December 31, 1930; (2) from January 1, 1931 to June 30, 1933; and (3) from July 1, 1933 onward. There is warrant for this action where conditions justify it. (Lindheimer v. Illinois Bell Tel. Co., 292 U. S. 151, 158). The Commission had a right, of its own accord, to take note of the changed economic level, since the close of the hearings: A. T. & S. F. Ry. Co. v. United States, 284 U. S. 248; Central Ky. Nat. Gas Co. v. R. R. Com., 290 U. S. 264. The Commission in calculating the allowable gross income for the first two periods, fixed the rate of return at 7% on the fair value of respondent's used and useful

property in the Spring Brook division; but in the return allowed for the third period fixed the rate at 6%, saying: "Under date of April 2, 1934, this Commission by resolution announced that so long as the present economic conditions of the country exist, this Commission believes that an annual rate of six per cent to public service companies under its jurisdiction is a fair and reasonable return on the value of the property used and useful in the rendition of the service to the public."

We are not to be understood as approving a blanket order fixing the maximum fair and reasonable return to be allowed public service companies on the value of their property used and useful in the public service, at six per cent. The Supreme Court of the United States has said that the allowable rate of return is dependent on the facts of the particular case. What may be a fair return for one may be inadequate for another, depending upon circumstances, locality and risk: United Rys. v. West, 280 U. S. 234, 251, 252; Wabash Valley Elec. Co. v. Young, 287 U. S. 488, 501, 502; Bluefield Water Works v. P. S. C., 262 U. S. 679, 692, 693; Willcox v. Consolidated Gas Co., 212 U. S. 19, 48, 49. For many years public service companies were looked upon as safe and stable business investments, with a reasonable likelihood of regular and consistent income returns. But the experience of the past ten years has shown that so far from all of them being safe and stable investments, some are, even when well and conservatively managed, extremely hazardous. Railroads are largely in distress throughout the country. Street railways, except, possibly, in large cities, have to a great extent been put out of business by bus and automobile competition. Toll bridges have been affected by tunnels and free bridges erected at state or municipal expense. Gas companies have been driven from the lighting field by electricity, and had they not devoted themselves to cooking and heating, would have gone by the board.

These are only a few examples out of many which could be given. Hence no hard and fast rule fixing the maximum allowable return at six per cent can be sustained. But a water company, well established in business, is perhaps as free from hazards and uncertainties of return as any public service corporation can be. The evidence in the record justifies the action of the Commission in this particular case and we will not disturb it. See Lindheimer v. Illinois Bell Tel. Co., supra.

### Trends Since July 1, 1928.

The fair value of respondent's property used and useful in the public service as of July 1, 1928, the effective date of the respondent's tariff complained of was determined as to most of the property on the basis of the reproduction cost less accrued depreciation; as to some parts, which were recently constructed under conditions not materially different, on the basis of actual cost less accrued depreciation. The engineering expense, on both sides, in connection with such a valuation was enormous. The Commission in establishing three periods for schedule rates did not think it necessary to duplicate or triplicate this work and expense by doing the work over a second and a third time. It felt that the changes in valuation could be reasonably accurately determined by applying the unit prices on labor and materials entering into the construction of respondent's works prevailing during those periods. This it did most carefully and painstakingly. Its work is not subject to the criticism of the Supreme Court of the United States in West et al. v. Chesapeake & Potomac Telephone, 295 U. S. 662. There a valuation established by the District Court in 1923 was adopted by the Commission, and without any appraisal of the physical plant, the value on December 31, 1932,—practically nine years later—was attempted to be determined "by translating the dollar value of the plant as it was found

by the District Court at December 31, 1923, plus net additions in dollar value in each subsequent year, into an equivalent of dollar value at December 31, 1932." But the Commission in that case did not restrict its trends to the labor and materials entering into the plant to be valued, but took general price trends covering commodities that had no relation to the respondent's system except that they were purchasable by the stockholders and were exchangeable for other requirements and desires of the stockholders and persons who used the dollar as a measure of value. It was on that account that the method was held inapt and improper to obtain a fair or accurate result. The method adopted by the Commission in this case is not subject to the same criticism. See McCardle v. Indianapolis Water Co., 272 U. S. 400, 405, etc.; Los Angeles Gas Co. v. R. R. Com., 289 U. S. 287, 301. In our opinion the Commission's findings as respect the trends or changes in the applicable unit prices involved in valuing the respondent's property and plant are reasonably supported by the evidence.

In view of our conclusions before stated it is not necessary to take up at this time other matters presented by each of the appellants. They may be resolved without difficulty in the report of the Commission filed pursuant to this opinion. We find no fundamental error other than we have adverted to.

It seems proper to add that the brief of the intervening appellant shows a misapprehension of the principles of reproduction cost valuation. In discussing the statement of Fritz [a witness for respondent] that he would not use trenching machines, primarily on account of underground interference from the gas company, the electric light company, and the sewage department, the brief states (p. 34) "not one of which is shown to have existed prior to the construction of the water system, and all of which in the course of development of any

community are generally constructed subsequent to the water mains." All very true, but wholly beside the point here. Trench digging machines were not in use either when the present mains and pipes were laid. The intervening appellant cannot apply modern inventions, apart from modern conditions, to the reproduction of this plant. If the plant is to be reproduced now with modern appliances it must be subject to present conditions.

The complainants were not hurt by the fact that the order allows respondent sixty days from the date of final adjudication of these proceedings to file their several tariff schedules; for they become effective from the respective dates fixed in the report and order, to wit, the first from July 1, 1928 to December 31, 1930, the second from January 1, 1931 to June 30, 1933, and the third from July 1, 1933 onward.

The order is reversed and the record is remitted to the Commission with directions to reform the findings, valuations and allowable return in accordance with this opinion.

Judge JAMES took no part in the consideration or decision of this case.