Berner, Appellant, v. Pennsylvania Public Utility Commission.

Argued April 20, 1954. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE and ERVIN, JJ.

*Arthur H. James,* with him *Leroy Long,* for appellants.

*John E. Fullerton,* Assistant Counsel, with him *Lloyd S. Benjamin,* Counsel, for Public Utility Commission, appellee.

*John C. Kelley,* with him *Robert J. Doran* and *Hull, Leiby & Metzger,* for telephone company, intervening appellee.

OPINION BY GUNTHER, J., September 27, 1954:

On November 12, 1952, Commonwealth Telephone Company (hereinafter called Commonwealth) filed proposed new tariffs providing for rate increases for local exchange service. On January 5, 1953, the Pennsylvania Public Utility Commission suspended operation of the proposed rates for a period of six months and instituted an investigation to determine fairness of proposed rates. On June 30, 1953, the suspension was again extended to October 11, 1953, and later, by agreement, extended further to November 10, 1953.

Complaints against the rate increases were filed by Clyde E. Berner et al., at C 15845, Cadwallader Evans, Jr., at C 15852; Bryan A. Breish et al., at C 15858; Jerome B. Marshall at C 15860; Henry L. Jones 2d. at C 15861; C. A. Woodruff at C 15862. The complaints were consolidated for the purpose of the case. Hearings were held between March 10, 1953 and October 16, 1953. Briefs, exhibits and transcript were filed with the Commission on January 9, 1954. After argument, an order was issued approving the proposed rates. This appeal is from the order of the Commission.

*Operating revenues under proposed rates.*

Does the evidence substantiate the findings of the Commission? Are additional operating revenues under proposed rates properly estimated and justified? The Commission so found. The question before the Court is whether the record supports the Commission's system of estimating the amount to be produced by the proposed higher rates. It is specifically pointed out that the Commission ignored or failed to take into consideration the enormous increase that took place in the number of new subscribers after September 30, 1952, the cut-off date in this case.

It is argued that had the Commission considered this increase the receipts would have resulted in the amount of $1,630,098.00 or $89,000.00 more than the amount actually received by the Commonwealth during the year ending September 30, 1952. It is contended that this was an error of law and that the Commission should have taken account of the increasing number of Commonwealth's subscribers and made a future prediction. The Commission, however, did not ask for a projected estimate by the Commonwealth of increased subscribers and use because that would also have required an estimate of the increased costs, taxes,

etc. In order to annualize the effect of growth of subscribers during the test year, corresponding adjustments should be made for expenses involved in handling the increase.

We see no error in the Commission's methods, which were based on actual experience and geared to the known costs and income. As long as the Commission uses methods reasonably calculated to produce accurate findings, we shall not override its judgment. It may use its judgment in adopting what it considers most reliable, practical, and realistic bases for determining revenues and expenses for rate purposes.

We do not believe that the evidence supports appellants' point that the estimated annual revenues under the proposed rates should be increased by $89,-000.00 over and above the amount actually received during the year ending September 30, 1952.

*Operating expenses:*

Appellants complain that the operating expenses allowed by the Commission are unreasonable and improper. Should the Commission have disallowed additional expenses? The Commonwealth originally claimed expenses amounting to $933,217.00 but the Commission, in its order, allowed $909,978.00. Appellants object to Commission's allowance of certain payments made by Commonwealth to its affiliated interests. It is pointed out that Sterling Farms, an affiliated company received $3,543.00 for administrative expenses and $2,273.00 as Contractor's profit over and above hourly wage of its farm workers. There is no evidence that the amounts are excessive or unreasonable. Appellants argue that the above amounts of administrative cost should have been disallowed by reason of the fact that another affiliate, the Public Service of Pennsylvania Inc., was receiving a management fee for this very type of service. The record, however,

discloses that the amounts in question were for trimming trees, whereas payments to Public Service were for executive salaries. The Commonwealth otherwise would have to maintain its own tree trimming crew, which is not the practice among utilities, or employ somebody to do the trimming.

*Original cost:*

Appellants contended that the Commission used wrong basis in arriving at the measure of value of original cost. What is the basis used by the Commission? It took into consideration the original cost of Commonwealth's plant as of December 31, 1946, the date of its reclassification; it examined the Bradford County Telephone Company's original cost as of December 31, 1947; and Luzerne Telephone Company's original cost as of December 31, 1947 (the three companies were merged in September 1950). To the resulting dollar amounts the Commission added plant addition and deducted plant retirements to bring the cost basis up to the cut-off date, September 30, 1952.

The appellants maintain that the telephone original cost orders promulgated by the Commission for each of Commonwealth's three predecessors are an inadequate basis for determining original cost, because they were not findings of value at the time they were proclaimed but accounting orders only. The answer to this particular assignment of error is, that although these T.O.C. orders were not findings of value by the Commission, they resulted from a system of accounting instituted some years ago by the Commission. One of the main purposes of this accounting system was to make available data as to original cost of utilities. See *Scranton-Spring Brook Water Service Company v. Pa. P. U. C.,* 165 Pa. Superior Court 286; 67 A. 2d 735. The T.O.C. orders, therefore, provide a good basis for the Commission's determination of original cost

as a measure of value. No evidence was introduced by appellants to refute Commission's measure of original cost. There is, on the other hand, adequate evidence which the Commission could consider and use as basis for its original measure of value. Was the use of T.O.C. order a violation of the statute? The Public Utility Law prescribes a system of accounts, whereby the plant account of a utility may be reclassified to show a picture of original cost. The underlying reason for using the system is to arrive at a figure that would reflect the cost of the property when first put to use for public service. The original costs considered by the Commission in determining fair value is a lawful and reasonable measure.

*Inter-Company transactions:*

The appellants question a number of charges paid by Commonwealth for plant additions to other companies in which Senator Sordoni has an interest. *Solar Electric Company v. Pa. P. U. C.*, 137 Pa. Superior Ct. 325, 9 A. 2d 447, is cited as authority for appellant's objection to this system of inter company relationship. We do not uphold this objection. The Supreme Court of Pennsylvania passed upon this system in *Bell Telephone Company of Pennsylvania v. Driscoll*, 343 Pa. 109, 21 A. 2d 912. The record in this case is devoid of any facts that distinguish the system used by Commonwealth from the system used by Bell of Pennsylvania. The gist of the objections is that Commonwealth's construction work was done by a Company owned and controlled by Senator Sordoni who also owns most of Commonwealth's stock. Except in the case of a few minor items, which are de minimis, appellants are unable to present adequate competent evidence that the plant additions were improper, unnecessary or too costly. The fact that the work was done and a profit made by an affiliate raises only the

necessity of close scrutiny of the transactions which, in the absence of evidence, we can presume was given by the Commission.

*Montrose Inn Exchange Facilities:*

To the same effect are appellants' objections to the allowance for operating expenses, a great part of which represents payments to affiliates for various services. The Montrose Inn account represents an expenditure of $34,000.00 for alterations. Space in the Montrose Inn for the operation of a telephone exchange is under lease to the Commonwealth for a period of ten years. Appellants insist that the $34,000.00 should have been expended the year in which the alterations were made and not reflected as cost in the plant account. The Commission however, considered the improvements and alterations of Montrose Inn as capital addition and set it up on an amortization basis for the life of the lease.

*Motor vehicles:*

The sum involved in the motor vehicles purchased is $55,529.00 and was also paid to an affiliate interest. Appellants interpret the law as requiring a utility to obtain approval of the Commission whereby transactions of this kind are made and the cost is incorporated in the plant account. We, however, agree with the Commission that a utility need not obtain approval for purchase of material from an affiliate unless the property involved in the transaction had been previously used in public service. The vehicles were not used in public service prior to the transaction and therefore, it was proper to consider their cost as part of the plant account as an original cost measure of value.

*$475,000.00 allowance for materials:*

The Commonwealth sought $513,426.00 for materials and supplies. The Commission allowed $475,-

000.00 after deduction of $38,426.00. Was the amount of $475,000.00 reasonable and proper? We believe that under the circumstances the Commission committed no error in concluding that an allowance of $475,000.00 for material and inventories for operation was reasonable. New construction, dial conversion and general expansion, as supported by the record, required large supplies of materials to carry out Commonwealth's program. There is no evidence of over stocking or unreasonable time within which the materials were left unused. The Commission has the right to use its own judgment to decide whether four or five months of supplies of cable and switchboards constitute a reasonable inventory. The record shows that Commonwealth's business has been expanding tremendously in recent years; and, in order to provide sufficient service for new customers, the Commonwealth has embarked on new construction and expansion of old facilities. Much of this allowance is to cover the expansion as well as current maintenance requirements. Such a purpose is a justifiable basis for the Commission's findings. Where there has been no error of law and where the findings are supported by competent evidence, we will not disturb an allowance for materials and supplies which is necessarily a judgment figure. *Pittsburgh v. Pa. P. U. C.,* 174 Pa. Superior Ct. 363, 101 A. 2d 761. This Court will not go into the question of inventories or supplies where evidence of flagrant disregard of reason in stocking of materials is absent. That is the function of the Commission.

*Rate of return:*

In our scope of review the question of rate of return affords an interesting subject in rate cases. The Commonwealth and appellants, as well as the Commission, present reasonable arguments in support of their

respective theories. Price of money or worth of capital, as often called, are controversial matters in view of world economic changes. Interest rates, as a cost of money, fluctuate depending on international affairs and political outlook. Under these circumstances and the unique position of Commonwealth, the question of whether 6.87% is a fair return is in order. Commonwealth, basing its requirement upon cost of capital and existing lag between increased costs and additional revenues, attempted to justify 7.5% as a fair return. The Commission made its own independent findings of capital costs for debt, preferred and common stocks. Applying the above findings to the Commonwealth's financial status, the Commission found 6.66% as the cost of capital in the instant case. The fair rate of return to the Commonwealth was set by the Commission at 6.8%. This figure was arrived at by relating its findings to the actual relative weight of Commonwealth's capital structure. It is quite true that the rate set is somewhat higher than the finding but we are aware that our Appellate Courts have recognized the validity of similar actions in similar cases. *Philadelphia Transportation Company v. Pa. P. U. C.,* 155 Superior Ct. 9, 37 A. 2d 138; *City of Pittsburgh v. Pa. P. U. C.,* 171 Pa. Superior Ct. 187, 90 A. 2d 607; *Pittsburgh v. Pa. P. U. C.,* 174 Pa. Superior Ct 363, 101 A. 2d 761. The Commission may exercise its own judgment in arriving at a composite cost of capital where evidence on rate of return exists and is substantial. We find no error in Commission's finding that 6.8 per cent is a fair return. As long as the Commission uses methods reasonably calculated to produce accurate findings, we shall not disturb its judgment.

Order affirmed.

DISSENTING OPINION BY RHODES, P. J.:

I dissent from the majority opinion which affirms the order of the Pennsylvania Public Utility Commission in this contested rate case. The record should be returned to the Commission for complete review, and especially that the Commission may make adequate findings supported by evidence on at least two matters: (1) Transactions between the utility and affiliates; and (2) rate of return. To comprehend these questions it is important to review the basic facts relating to this appeal by ratepayers.

The appeal is from the final order of the Commission dismissing complaints against an increase in rates requested under tariff supplements filed by the Commonwealth Telephone Company on November 10, 1952. These supplements increased local exchange service rates of 22,395 subscribers. The increase was 39 per cent in local service revenues at the level of subscribers served at September 30, 1952. The increases range from 35.71 per cent for class A, two-party residence, to 60 per cent for class E, one-party residence. Complaints against the increased rates were duly filed by ratepayers. The tariffs were suspended by the Commission, which, after hearings, rendered its report and order sustaining the increases on November 9, 1953.

The present Commonwealth Telephone Company was incorporated September 27, 1950, to effect the merger of Commonwealth Telephone Company, Luzerne Telephone Company, and Bradford County Telephone Company. As a result of the merger, Commonwealth serves all or parts of the counties of Luzerne, Lackawanna, Wyoming, Bradford, Sullivan, Susquehanna, Columbia, and Schuylkill. Of the total issue of Commonwealth's common stock of 107,365 shares, 102,117 are owned by former State Senator Andrew J. Sordoni, presently Secretary of Commerce, members

of his family, and Public Service of Pennsylvania, Inc., which is owned by Sordoni. The entire issue of Junior Preference Stock is owned by Sordoni and Sordoni Construction Company, the latter company solely owned by Sordoni. For the years 1948 to 1952, inclusive, Commonwealth contracted for construction work and additions to its plant amounting to $4,500,000. All of the construction work was performed by Sordoni Construction Company without any competitive bids having been obtained by Commonwealth. In addition, Commonwealth has a management contract with Public Service and has had numerous dealings with other companies wholly owned by Sordoni whereby these companies supplied Commonwealth with materials and supplies. The propriety and reasonableness of these transactions, which are reflected in the rate base and in operating expenses, have been seriously questioned on this appeal.

The engineering and accounting firm of Day and Zimmerman, Inc., had been employed by Commonwealth during 1950 preparatory to filing an increase in rates at that time, and that firm reported that, as of January 31, 1951, Commonwealth could not justify any increase in its rates.

TRANSACTIONS WITH AFFILIATES. The law regarding transactions between affiliated companies in public utility rate cases is well defined. "Charges arising out of intercompany relationship between affiliated companies should be scrutinized with care (Johnsonburg v. P. S. C., 98 Pa. Superior Ct. 284, 291; Chambersburg Gas Co. et al. v. P. S. C., 116 Pa. Superior Ct. 196, 226, 176 A. 794); and if there is an absence of data and information from which the reasonableness and propriety of the services rendered and the reasonable cost of rendering such services by the servicing companies can be ascertained by the commis-

sion, allowance is properly refused (New York State Electric & Gas Corporation et al. v. P. S. C. et al., 245 App. Div. 131, 281 N.Y.S. 384, 274 N.Y. 591, 10 N.E. 2d 567, 275 N.Y. 534, 11 N.E. 2d 736; Smith v. Illinois Bell Telephone Co., 282 U. S. 133). . . .

"The desire of public utility management, evidenced by various methods, to secure the highest possible return to the ultimate owners is incompatible with the semi-public nature of the utility business, which the management directs. It therefore follows that the commission should scrutinize carefully charges by affiliates, . . .": *Solar Electric Company v. Pennsylvania Public Utility Commission*, 137 Pa. Superior Ct. 325, 374, 9 A. 2d 447, 473. See, also, *Scranton-Spring Brook Water Service Co. v. Public Service Commission*, 119 Pa. Superior Ct. 117, 142, 181 A. 77; section 701 (a) and (c), Act of May 28, 1937, P. L. 1053, 66 PS §1271; *Schuylkill Valley Lines, Inc., v. Pennsylvania Public Utility Commission*, 165 Pa. Superior Ct. 393, 405, 406, 68 A. 2d 448.

A management contract was entered into between Public Service and Commonwealth on October 11, 1928, providing that, effective March 1, 1928, Public Service would receive a management fee of 5 per cent of Commonwealth's gross revenue. As of October 1, 1951, this management fee was reduced to 2½ per cent of gross revenue. The record also shows that, as of September, 1952, the management fee of Public Service was fixed at $3,000 per month. Public Service maintained its office with Sordoni Construction Company and admittedly had no physical assets whatsoever. Prior to October 1, 1951, Public Service had no payroll, and, so far as the record shows, rendered no definite or specific service to Commonwealth. From October 1, 1951, to October 1, 1952 (the base year), Commonwealth paid Public Service $38,297.77, which

was reduced for future years to $36,000. The record establishes that, of the $36,000 paid to Public Service, only $10,900 was paid out in salaries. It nowhere appears what costs in excess of salaries were incurred by Public Service. The question involved is whether or not sufficient evidence was presented by Commonwealth to show the propriety of this charge as an operating expense. The burden of proof is on the utility to show that the payment was not excessive in view of the benefit or advantage accruing to the utility and in turn to the public by the management contract. *Dayton Power & Light Co. v. Public Utilities Commission,* 292 U. S. 290, 54 S. Ct. 647, 78 L. Ed. 1267, 1279; *Schuylkill Valley Lines, Inc. v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 393, 68 A. 2d 448; *Solar Electric Company v. Pennsylvania Public Utility Commission,* supra, 137 Pa. Superior Ct. 325, 9 A. 2d 447. It is apparent that transactions between affiliated companies complicate the task of rate making. Buyer and seller in such circumstances may not be dealing at arm's length, and the price agreed upon between them is likely a poor criterion of value. *American Telephone & Telegraph Company v. United States,* 299 U. S. 232, 57 S. Ct. 170, 81 L. Ed. 142, 149; *Scranton-Spring Brook Water Service Co. v. Public Service Commission,* supra, 119 Pa. Superior Ct. 117, 181 A. 77. A public utility must use all its receipts as a public trust and cannot dissipate them in an effort to secure further increases from the public. The Commission, in cases such as this, has not only the prerogative but also the duty to require full disclosure under legislative mandate to protect the public interest. *City of Fort Smith v. Southwestern Bell Telephone Co.,* 220 Ark. 70, 247 S. W. 2d 474. A commission should evidence a continuity of concern for the public when dealing with those businesses affected with a public interest.

On March 1, 1952, certain motor vehicles (fifty-three) were transferred from Sordoni Construction Company to Commonwealth at a depreciated book value of $55,529.71. The validity and the reasonableness of this transaction are likewise questioned. The Commission, without any evidence on the subject, assumed the transfer price was reasonable, relying upon and making reference to an alleged general commercial practice to transfer property between affiliates at book value to avoid the problem of taxable gain or loss. Proof of a general practice in making transfers between affiliates, subject to tax considerations, is no proof whatever that the transfer was made at a fair market value for utility rate case purposes. There were many other transactions with affiliates in this case where the prices paid were not shown to be fair and reasonable for rate case purposes. Among these was a charge of $34,000 for additions and alterations to the Montrose Inn, at Montrose, Pennsylvania, where one of Commonwealth's exchanges was located. Although Commonwealth was but a lessee of space in the Inn, the alterations were charged to Commonwealth's plant account and allowed by the Commission. Montrose Inn is owned by Montrose Inn, Inc., which in turn is owned by Sordoni.

It is apparent that on this record evidence is entirely lacking in many instances to support the reasonableness of these transactions and charges by affiliates, and the utility failed to meet its burden of proof in this respect. The Commission's allowance of such items was not warranted by the evidence. Under the law it was the duty of the Commission to scrutinize these transactions, and the utility had the burden of proving the prices paid were reasonable. The Commission here wholly misconceived its duty in this respect and treated the lack of evidence as though it were

34

positive evidence. The majority opinion is also basically erroneous when it assumes lack of evidence is the equivalent of affirmative proof. The majority opinion states: "There is no evidence that the amounts [paid to affiliated interests] are excessive or unreasonable." Again it says: "The fact that the work was done and a profit made by an affiliate raises only the necessity of close scrutiny of the transactions which, in the absence of evidence, we can presume was given by the Commission."

The majority opinion further states: "This Court will not go into the question of inventories or supplies where evidence of flagrant disregard of reason in stocking of materials is absent." It is significant that Commonwealth's inventory rose from $298,988 to $438,823 from the end of 1950 to the end of 1951. The Commission reduced Commonwealth's claim for materials and supplies from $513,426 to $475,000. However, if, as stated by the majority, much of this allowance is to cover expansion as well as current maintenance requirements, then consideration should be given by the Commission to the prospective return from such expansion. This was not done.

Upon review this Court may scrutinize the facts upon which the order is based for the purpose of determining whether or not the findings have been arbitrarily or capriciously made. The findings of the Commission must be sufficiently definite and detailed to enable the reviewing court to determine the controverted questions. *Aizen v. Pennsylvania Public Utility Commission*, 163 Pa. Superior Ct. 305, 60 A. 2d 443; section 1005, Act of May 28, 1937, P. L. 1053, 66 PS §1395. The record in this case should be remitted to the Commission for further proceedings so that the Commission can make proper findings on whatever evidence may be adduced as to the propriety

of the transactions between the affiliated companies and Commonwealth. The majority opinion cites *Bell Telephone Company of Pennsylvania v. Driscoll*, 343 Pa. 109, 21 A. 2d 912, as controlling the transactions between Commonwealth and the affiliated companies. This decision has no application. It merely held that section 702 of the Public Utility Law of 1937, as amended, 66 PS §1272, requiring commission approval of a contract between a public utility and an affiliated interest as a precedent to its validity, was unconstitutional.

RATE OF RETURN. The Commission found a rate of return for this utility of 6.8 per cent, which is an allowance after all other operating expenses have been covered. On the record in this case, in my opinion, such a rate of return cannot be sustained. The rate of return necessarily varies with the circumstances of each case and should be determined from the evidence adduced. *Solar Electric Company v. Pennsylvania Public Utility Commission*, supra, 137 Pa. Superior Ct. 325, 388, 9 A. 2d 447; *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 171 Pa. Superior Ct. 187, 207, 90 A. 2d 607. The rate of return should be adequate, and of course it may not be confiscatory. *Schuylkill Valley Lines, Inc. v. Pennsylvania Public Utility Commission*, supra, 165 Pa. Superior Ct. 393, 68 A. 2d 448.

The evidence does not support the Commission's finding of a return of 6.8 per cent. For instance, the utility claimed 4.5 per cent and the Commission found 4.3 per cent as the cost of debt capital, whereas, admittedly the utility obtained a loan of $1,200,000—$1,600,000 on mortgage bonds from insurance companies in August, 1953, at 4 per cent. The Commission found the current cost of equity capital to Commonwealth to be 11 per cent. While necessarily a judgment

figure, there is little or no evidence to support this conclusion which is entirely arbitrary. This privately owned and financially secure company, part of a larger system of privately owned enterprises, is in a unique position relative to cost of capital. Its status in this regard is analogous to the Bell system, with which it is connected, rather than the ordinary small independent telephone company. In *Blue Mountain Telephone & Telegraph Company v. Pennsylvania Public Utility Commission*, 165 Pa. Superior Ct. 320, 67 A. 2d 441, the Company, with a fair value of $325,000, was allowed only a 6 per cent return as sufficient to attract capital and to keep its enterprise stable and profitable. Here the Commission allowed the return 6.8 per cent to Commonwealth on the basis of $5,651,904. The utility is entitled to a fair rate of return based on all the facts, but on this point Commonwealth's history and unusual position cannot be ignored.

The findings of the Commission on rate of return were so arbitrary, unreasonable, and unsupported by evidence as to amount to an error of law. Under the Act we are empowered to examine the record and findings of the Commission to determine whether proper weight was given to the evidence. Section 1005, Act of May 28, 1937, P. L. 1053, 66 PS §1395. Moreover, the burden of proof to show that a proposed increase in rates is just and reasonable is upon the utility (section 312, Act of May 28, 1937, P. L. 1053, 66 PS §1152; *Philadelphia v. Pennsylvania Public Utility Commission*, 173 Pa. Superior Ct. 38, 95 A. 2d 244); and an order of the Commission granting such increase must be supported by substantial evidence (section 1107, Act of 1937, as amended, 66 PS §1437; *Ruettger v. Pennsylvania Public Utility Commission*, 164 Pa. Superior Ct. 388, 64 A. 2d 675). This Court's review is not precluded where the Commission has arbitrarily

ignored material and undisputed evidence, misconstrued the facts, or misapplied the law. *Pittsburgh v. Pennsylvania Public Utility Commission,* 370 Pa. 305, 315, 88 A. 2d 59; *City of Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 187, 198, 90 A. 2d 607. The record should be returned to the Commission with direction to make adequate findings which are supported by evidence.

Judge Ross joins in this dissent.

Judge Hirt joins in this dissent in so far as it relates to rate of return.